Paul DICKSON, III, George E. Nicholson, III, Robert S. Powell, Jr., James A. Medford, Eunice H. Milton, John E. Greenbacker, Jr., Eric E. Van Loon, Ernest S. McCrary, Gary E. Waller, Stuart E. Matthews, John McSween, Henry N. Patterson, Jr., and Frank Wilkinson and Herbert Aptheker, Plaintiffs,

v.

J. Carlyle SITTERSON, Acting Chancellor of the University of North Carolina at Chapel Hill; William C. Friday, President of the University of North Carolina; the Board of Trustees of the University of North Carolina, a Body Politic and Corporate Known and Distinguished by the Name of the "University of North Carolina," Defendants.

No. C-59-G-66.

United States District Court
M. D. North Carolina,
Greensboro Division.

Feb. 19, 1968.

McNeill Smith, Greensboro, N. C., for plaintiffs.

T. Wade Bruton, Atty. Gen., of North Carolina, Ralph Moody, Deputy Atty. Gen., of North Carolina, Andrew A. Vanore, Jr., Staff Attorney, Raleigh, N. C., and William T. Joyner, William T. Joyner, Jr., and James M. Kimzey, Raleigh, N. C., for defendants.

Daniel H. Pollitt, Chapel Hill, N. C., R. Mayne Albright, Raleigh, N. C., Lisbon C. Berry, Jr., Wilmington, N. C., Hugh G. Casey, Jr., Charlotte, N. C., Renn Drum, Jr., Winston-Salem, N. C., Charles F. Lambeth, Jr., Thomasville, N. C., James Mattocks, High Point, N. C., and William L. Thorp, Jr., Rocky Mount, N. C., for North Carolina Civil Liberties Union, amicus curiae.

William W. Van Alstyne and J. Francis Paschal, Durham, N. C., for The American Association of University Professors and The North Carolina Conference, amicus curiae.

Before HAYNSWORTH, Circuit Judge, and STANLEY, and BUTLER, District Judges.

EDWIN M. STANLEY, District Judge.

The plaintiff seeks to declare unconstitutional and enjoin the enforcement of § 116–199 and § 116–200, General Statutes of North Carolina, statutes regulating the appearance of visiting speakers at State-supported colleges and universities. Declaratory relief is sought under 28 U.S.C. § 2201 and injunctive relief is sought under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343 and 2281. Since the proceeding involves the constitutionality of State statutes, this three-judge Court was convened pursuant to 28 U.S.C. §§ 2281 and 2284.

The basic facts are not in dispute, and are to be found in the complaint and answer, with exhibits attached, stipulated facts and documents, and depositions.

From the pleadings, and stipulated facts and other documents, the following material facts are found:

## FACTS

1. At all times pertinent, the plaintiffs, except Wilkinson and Aptheker, were students duly enrolled and in good standing at the University of North Carolina at Chapel Hill, North Carolina. The student body consisted of approximately twelve thousand students and the plaintiff, Dickson, was the duly elected president of the student body.

2. At all times pertinent, the plaintiff students, except McSween and Patterson, were members and officers of unincorporated associations of students officially recognized by the University. The names of the plaintiff students, the respective organizations of which each was a member and officer, and the office held, were as follows:

(a) Paul Dickson, III, President, Student Government of University of North Carolina;

(b) George E. Nicholson, III, Chairman, Carolina Forum;

(c) Robert S. Powell, Executive Director, Carolina Forum;

(d) James A. Medford, President, Young Men's Christian Association;

(e) John E. Greenbacker, Jr., President, Dialectic and Philanthropic Literary Society;

(f) Eric E. Van Loon, Chairman, Carolina Political Union;

(g) Ernest S. McCrary, Editor, The *Daily Tar Heel,* student newspaper;

(h) Gary E. Waller, Member of Steering Committee, Students for a Democratic Society;

(i) Stuart E. Matthews, Member of Steering Committee, Students for a Democratic Society.

3. Each of the student organizations designated in the preceding paragraph

exists at the University of North Carolina, and each is composed of a number of students.

4. The plaintiff, Frank Wilkinson, is a citizen and resident of the State of California, and is Executive Director of the National Committee to Abolish the House Un-American Activities Committee.

5. The plaintiff, Herbert Aptheker, is a citizen and resident of the State of New York, and is Director of the American Institute for Marxist Studies.

6. When this action was commenced, the defendant, J. Carlyle Sitterson, was the Acting Chancellor of the University of North Carolina, Chapel Hill, and the defendant, William C. Friday, was the President of the University of North Carolina. Since the commencement of this action, the defendant Sitterson has been elected Chancellor. These individual defendants are officers and agents of the State of North Carolina, and in all matters referred to in the pleadings they acted in their capacity as officers and agents of the State of North Carolina, and are sued in their official capacities.

7. The defendant, Board of Trustees of the University of North Carolina, is a corporate body and an agency of the State of North Carolina. At all times pertinent, said Board of Trustees was authorized to make rules and regulations for the management of the University of North Carolina, and the defendants Sitterson and Friday were authorized to implement and carry out the directives of said Board of Trustees.

8. The 1963 General Assembly of North Carolina enacted Chapter 1207 of the Session Laws (codified as G.S. § 116–199 and § 116–200), regulating visiting speakers at State-supported colleges and universities, as follows:

"§ 116–199. No college or university, which receives any State funds in support thereof, shall permit any person to use the facilities of such college or university for speaking purposes, who:

(A) Is a known member of the Communist Party;

(B) Is known to advocate the overthrow of the Constitution of the United States or the State of North Carolina;

(C) Has pleaded the Fifth Amendment of the Constitution of the United States in refusing to answer any question, with respect to Communist or subversive connections, or activities, before any duly constituted legislative committee, any judicial tribunal, or any executive or administrative board of the United States or any state.

§ 116–200. This Act shall be enforced by the Board of Trustees, or other governing authority, of such college or university, or by such administrative personnel as may be appointed therefor by the Board of Trustees or other governing authority of such college or university."

9. Thereafter, on July 8, 1963, the Executive Committee of the Board of Trustees of the University of North Carolina adopted the following regulation and policy statement:

"The facilities of the Consolidated University of North Carolina shall be denied to any visiting speaker who is known to be a member of any Communist Party; or is known to advocate the overthrow of the Constitution of the United States or the State of North Carolina; or is known to have pleaded the Fifth Amendment of the Constitution of the United States in refusing to answer any question, with respect to Communist or subversive connections, or activities, before any duly constituted legislative committee, any judicial tribunal, or any executive or administrative board of the United States or any state.

This policy shall be enforced by student representatives of student organizations authorized to invite visiting speakers and by any member of the faculty or administrative official who invites a visiting speaker to the campus."

10. After the enactment of Chapter 1207 of the Session Laws of 1963, commonly referred to as the "Speaker Ban" law, the statute became a matter of

widespread public concern. As a consequence, the 1965 General Assembly, by resolution adopted on June 16, 1965, created a Commission to study the statutes and report the results of its study to the Governor of North Carolina. The Commission members consisted of five lawyers, two industrial manufacturers, one newspaper editor, and one Baptist minister, and their residence was distributed over the several geographical areas of the State.

11. The aforesaid Study Commission filed its report on November 5, 1965, which report included the following recommendations:

"1. Subject to Recommendation No. 2, we recommend that Chapter 1207 of the 1963 Session Laws be amended so as to vest the trustees of the institutions affected by it not only with the authority but also with the responsibility of adopting and publishing rules and precautionary measures relating to visiting speakers covered by said Act on the campuses of said institutions. We submit as a part of this report a proposed legislative bill to accomplish this purpose.

2. We recommend that each of the Boards of Trustees of said institutions adopt the Speaker Policy hereto attached and made a part of this Report.

3. In order that this important matter might be settled forthwith, we recommend that you, The Governor of North Carolina, request the boards of trustees of the affected institutions to assemble as soon as practicable for purpose of giving consideration to the aforementioned Speaker Policy, and at such time as it has been adopted by the said boards of all of said institutions, that you cause to be called an extraordinary Session of the General Assembly for purpose of considering amendments to Chapter 1207 of the 1963 Session Laws as hereinbefore set forth."

12. The Speaker Policy, attached to and made a part of the report of the Study Commission, provided as follows:

"The Trustees recognize that this Institution, and every part thereof, is owned by the people of North Carolina; that it is operated by duly selected representatives and personnel for the benefit of the people of our state.

The Trustees of this Institution are unalterably opposed to Communism and any other ideology or form of government which has as its goal the destruction of our basic democratic institutions.

We recognize that the total program of a college or university is committed to an orderly process of inquiry and discussion, ethical and moral excellence, objective instruction, and respect for law. An essential part of the education of each student at this Institution is the opportunity to hear diverse viewpoints expressed by speakers properly invited to the campus. It is highly desirable that students have the opportunity to question, review and discuss the opinions of speakers representing a wide range of viewpoints.

It is vital to our success in supporting our free society against all forms of totalitarianism that institutions remain free to examine these ideologies to any extent that will serve the educational purpose of our institutions and not to the purposes of the enemies of our free society.

We feel that the appearance as a visiting speaker on our campus of one who was prohibited under Chapter 1207 of the 1963 Session Laws (The Speaker Ban Law) or who advocates any ideology or form of government which is wholly alien to our democratic institutions should be infrequent and then only when it would clearly serve the advantage of education; and on such rare occasions reasonable and proper care should be exercised by the institution. The campuses shall not be exploited as convenient outlets of discord and strife.

We therefore provide that we the Trustees together with the administration of the Institution shall be held responsible and accountable for visit-

ing speakers on our campuses. And to that end the administration will adopt rules and precautionary measures consistent with the policy herein set forth regarding the invitations to and appearance of visiting speakers. These rules and precautionary measures shall be subject to the approval of the Trustees."

13. On November 12, 1965, the Board of Trustees of the University of North Carolina, acting within their statutory authority, adopted a policy regarding visiting speakers in the identical words as recommended by the Study Commission.

14. Thereafter, in an extra Session, the North Carolina General Assembly, on November 17, 1965, amended G.S. § 116–199 and § 116–200 to read as follows:

"§ 116–199. Use of facilities for speaking purposes.—The board of trustees of each college or university which receives any State funds in support thereof, shall adopt and publish regulations governing the use of facilities of such college or university for speaking purposes by any person who:

(1) Is a known member of the Communist Party;

(2) Is known to advocate the overthrow of the Constitution of the United States or the State of North Carolina;

(3) Has pleaded the Fifth Amendment of the Constitution of the United States in refusing to answer any question, with respect to Communist or subversive connections, or activities, before any duly constituted legislative committee, any judicial tribunal, or any executive or administrative board of the United States or any state.

§ 116–200. Enforcement of article. —Any such regulations shall be enforced by the board of trustees, or other governing authority, of such college or university, or by such administrative personnel as may be appointed therefor by the board of trustees or other governing authority of such college or university."

15. On January 3, 1966, the plaintiffs Matthews and Waller invited the plaintiff Wilkinson to speak on the campus of the University of North Carolina at Chapel Hill on March 2, 1966, and the plaintiff Aptheker to speak on March 9, 1966, under the sponsorship of the Students for a Democratic Society. These invitations were personally approved by the defendant Friday and by Chancellor Paul Sharp, who was then the Chancellor of the University of North Carolina at Chapel Hill, but no official action was taken.

16. The plaintiff Wilkinson had in 1952 pleaded the Fifth Amendment of the Constitution of the United States in refusing to answer questions put to him by the legislative committee of the State of California, which was investigating Communist or subversive connections or activities. The questions to which Wilkinson pleaded the Fifth Amendment were questions with respect to his Communist or subversive connections or activities, and the said Legislative Committee was a duly constituted Legislative Committee of the State of California.

17. On January 14, 1966, the Executive Committee of the Board of Trustees, meeting on one of the campuses of the University of North Carolina, acting within their statutory authority and pursuant to G.S. § 116–199 and § 116–200, adopted the following procedures to apply to visiting speakers:

"1. All statutes of the State relating to speakers and the use of facilities for speaking purposes are to be obeyed (1941 law and others).

2. Only recognized student, faculty and University organizations are authorized to invite speakers.

3. Non-University organizations authorized through official channels (e. g., Extension Division) to meet on the campus are to be routinely informed that the use of facilities must conform to State laws.

4. Student attendance at campuswide occasions is not compulsory.

5. The appearance of speakers on campus does not imply approval or disapproval of them or what is said by the speaker.

6. As a further precaution and to assure free and open discussion as essential to the safeguarding of free institutions, each Chancellor, when he considers it appropriate, will require any or all of the following:

a. That a meeting be chaired by an officer of the University or a ranking member of the faculty;

b. That speakers at the meeting be subject to questions from the audience;

c. That the opportunity be provided at the meeting or later to present speakers of different points of view."

18. On January 14, 1966, Roy James McCorkle, Jr., who was then the president of Students for a Democratic Society, made a written request for reservation of space to the Reservations Secretary at the Central Reservations Office of the University of North Carolina at Chapel Hill, requesting Carroll Hall Auditorium from 8 p. m. to 10 p. m. on February 28, or March 2, 1966, for a speech by the plaintiff Wilkinson, and Memorial Hall Auditorium from 8 p. m. to 10 p. m. on March 9, 1966, for a speech by the plaintiff Aptheker. The Reservations Secretary confirmed the fact that space was available at each of these places on the dates requested.

19. On January 28, 1966, the Executive Committee of the Board of Trustees of the University met in the office of the Governor of North Carolina and discussed the pending appearances of the plaintiffs Wilkinson and Aptheker. The defendants Friday and Sitterson, and Chancellor Paul Sharp, who was then the Chancellor of the University of North Carolina at Chapel Hill, supported these invitations in statements to the Executive Committee of the Board of Trustees. Chancellor Sharp set up the format of a panel discussion, with a former dean of the University Law School presiding, and with other faculty members on the panel, to be able, if appropriate, to rebut anything that might be said. Following the meeting, the Governor of North Carolina issued the following statement:

"February 1, 1966

STATEMENT BY GOVERNOR
DAN MOORE

I am calling a meeting of the Executive Committee of the Trustees of the University of North Carolina in the Governor's Office for 3:30 p. m., Monday, February 7, 1966, to settle the question of whether Herbert Aptheker and others will be permitted to speak on the University campus.

When the Executive Committee met last Friday to consider this matter, I made it clear to the Committee that I did not think it should permit these persons to speak on the University campus. An appointment in Washington made it necessary for me to leave the Executive Committee meeting while it was in session, and I did not learn until later that the Committee failed to reach a decision on this question.

As Chairman of the Board of Trustees, I realize it is important that we measure up to the responsibilities given us as trustees by the General Assembly in dealing with the matter of speakers who will be permitted to speak on the University campus.

It should be obvious to everyone that the invitation under consideration was made in an effort to create controversy for the sake of controversy and not for any legitimate educational purpose. For this reason, I do not think the Trustees should permit this request to be granted."

20. On or about February 1, 1966, the plaintiffs Dickson, Nicholson and McCrary invited the plaintiff Aptheker to speak on the University campus on March 9, 1966, under the sponsorship of the Student Government, the Carolina Forum, and *The Daily Tar Heel*. The invita-

tion was accepted by plaintiff Aptheker on February 3, 1966.

21. On February 3, 1966, the faculty, and on February 6, 1966, the Faculty Advisory Committee, endorsed the recommendation of the Chancellor and President that plaintiff Aptheker be permitted to speak on March 9, 1966.

22. On February 7, 1966, the Executive Committee of the Board of Trustees of the University reconvened in the office of the Governor of North Carolina, at which time the following resolutions were adopted:

*"RESOLUTION No. 1*

The Executive Committee of the Board of Trustees of the University of North Carolina deny the use of University facilities for speaking purposes for the scheduled appearances of Herbert Aptheker and Frank Wilkinson.

*RESOLUTION No. 2*

The Executive Committee of the Board of Trustees of the University of North Carolina here suspends all invitations to speakers who are under the terms of G.S. 116–199 until formal action is taken by the Board of Trustees establishing rules and regulations governing visiting speakers, as required by law."

23. Shortly after the action of the Executive Committee of the Board of Trustees on February 7, 1966, Chancellor Sharp stated publicly: "In view of the commitments of a great university, this was an unfortunate action."

24. On February 8, 1966, the plaintiff students and many other students met in Murphey Hall on the campus of the University of North Carolina at Chapel Hill as a Committee for Free Inquiry, and the plaintiff Dickson was elected Chairman of the Steering Committee.

25. On February 10, 1966, the student government of the University of North Carolina at Chapel Hill unanimously adopted a resolution supporting the invitation to plaintiff Aptheker to speak on the campus on March 9, 1966, "on the basis of the principle of freedom of speech and academic freedom."

26. On February 24, 1966, the Committee for Free Inquiry sponsored an open meeting in Memorial Hall at the University for members of the student body and faculty on the subject of the speaker policy and procedures which the Board of Trustees was scheduled to consider on the following Monday, February 28, 1966. Approximately 1,200 persons attended the meeting, at the conclusion of which a statement of principle and policy on campus speakers was adopted by a voice vote. The statement was delivered to President Friday at his home later that evening.

27. On February 28, 1966, the Board of Trustees, acting pursuant to G.S. § 116–199 and § 116–200, adopted the following procedures and regulations regarding the appearance of visiting speakers:

*"Procedures Regarding Invitations to Speakers Affected by G.S. 116–199 and 200.*

In order to provide the Chancellors with an opportunity to exercise the responsibilities imposed upon them by trustee regulations respecting visiting speakers, the following procedures shall be observed prior to extending an invitation to any visiting speaker covered by G.S. 116–199 and 200.

1. The officers of a recognized student club or society desiring to use University facilities for a visiting speaker shall consult with the club's faculty adviser concerning the proposed speaker.

2. The head of the student organization shall submit to the Chancellor a request for reservation of a meeting place along with the following information:

(a) Name of the sponsoring organization and the proposed speaker's topic.

(b) Biographical information about the proposed speaker.

(c) Request for a date and place of meeting.

3. Upon receipt of the above information, the Chancellor shall refer the proposed invitation to a joint student-faculty standing committee on visiting speakers for advice. He may consult such others as he deems advisable.

4. The Chancellor shall then determine whether or not the invitation is approved.

Once a speaker affected by G.S. 116–199 and 200 has been invited and his acceptance received, his appearance on the campus shall be governed by these regulations:

*Regulations Regarding the Appearance of Visiting Speakers Affected by G.S. 116–199 and 200.*

1. All statutes of the State relating to speakers and the use of facilities for speaking purposes are to be obeyed.

2. Student attendance at campuswide occasions is not compulsory.

3. The appearance of speakers on the campus does not imply either approval or disapproval of the speakers or what is said by them.

4. As a further precaution and to assure free and open discussion as essential to the safeguarding of free institutions, each Chancellor, when he considers it appropriate, will require any or all of the following:

(a) That a meeting be chaired by an officer of the University or a ranking member of the faculty;

(b) That speakers at the meeting be subject to questions from the audience;

(c) That the opportunity be provided at the meeting or later to present speakers of different points of view.

The Chancellor shall keep the President informed of the application of these regulations covering the invitation to and the appearance of visiting speakers affected by G.S. 116–199 and 200."

28. On March 1, 1966, plaintiffs Dickson, Nicholson, Powell, Medford, Greenbacker, Van Loon, McCrary, Waller and Matthews, along with Eunice Milton, delivered to the defendant Sitterson a written request for permission for the plaintiff Aptheker to speak on the campus of the University of North Carolina at Chapel Hill on March 9, 1966, and for the plaintiff Wilkinson to speak on the campus on March 2, 1966. For each proposed speaker, the written request was accompanied by the name of the sponsoring organization, the topic of the proposed speech, and biographical information concerning the speaker. These requests complied with the requirements of the procedures and regulations which had been adopted by the Board of Trustees governing invitations to visiting speakers. The topic on which the plaintiff Wilkinson was to speak was the House Un-American Activities Committee, and the topic on which the plaintiff Aptheker was to speak was the war in Viet Nam.

29. The joint Student-Faculty Committee on visiting speakers, appointed pursuant to the procedures and regulations adopted by the Board of Trustees on February 28, 1966, met on the night of March 1, 1966, to consider what recommendations to make to Chancellor Sitterson in regard to the invitation to Frank Wilkinson to speak on the University campus on March 2, 1966. The Committee was sharply divided with respect to the action they should take, but a majority of the members recommended that the invitation to Wilkinson be rejected.

30. Thereafter, Chancellor Sitterson met with the Student-Faculty Committee and discussed the invitations that had been extended to both Wilkinson and Aptheker.

31. On March 2, 1966, the defendant Sitterson denied the request for approval of the invitation to the plaintiff Wilkinson to speak on the subject of the House Un-American Activities Committee on

the campus of the University on March 2, 1966, and stated publicly:

"On March 1, 1966, I received a request from the officers of several student organizations for a speaking appearance of Mr. Frank Wilkinson on the campus on March 2.

As soon as possible, I set up the faculty-student committee, provided for in Trustee regulations of February 28, and this committee gave the most careful and thorough consideration to the proposed invitation. I have also had the benefit of the thoughtful and thorough consideration of this matter by the faculty elected Advisory Committee. As would be expected, not everyone was of one mind and it should be clearly understood that while I greatly appreciate their helpful advice, the decision is entirely my own.

The Executive Committee of the Board of Trustees on February 7, 1966, cancelled the scheduled appearances in March of Mr. Frank Wilkinson and Mr. Herbert Aptheker. Consequently, even though prior to the Executive Committee action I recommended that the earlier invitation should be approved, I regard the Executive Committee's action as in effect binding in these two instances, and I do not at this time think I should grant permission for the use of University facilities for Mr. Wilkinson on March 2. I have informed President Friday of this decision and he concurs in the action taken.

J. Carlyle Sitterson
Acting Chancellor"

32. On March 3, 1966, Chancellor Sitterson advised the Student-Faculty Committee that it was useless for them to meet concerning the invitation to Aptheker to speak on March 9 since the reason for denying the invitation to Wilkinson to speak on March 2, 1966, applied equally to the invitation to Aptheker to speak on March 9, 1966, and there was no use for them to have a useless meeting about Aptheker.

33. On the afternoon of Wednesday, March 2, 1966, the plaintiff Wilkinson, standing on the public sidewalk on East Franklin Street in Chapel Hill, North Carolina, and behind a stone wall which separated the public street from the University campus, spoke to a large number of students. Many of the students were unable to hear his remarks because of interference of street noises, the absence of amplification equipment, and the noises made by the large crowd of people. At this time, the plaintiff Dickson announced that Wilkinson would be at Carroll Hall Auditorium on the campus at 7:30 o'clock that evening for the purpose of speaking. Carroll Hall Auditorium was frequently used by visiting speakers, and was not otherwise in use or scheduled to be used that evening. At the designated hour, a number of students, including at least four of the plaintiff students, were present at Carroll Hall for the purpose of hearing Wilkinson speak on the House Un-American Activities Committee. At that time, the Chief Police Officer of the University, acting on his own initiative and without specific instructions from anyone else, but within the scope of his authority as agent of the defendants, told Wilkinson that he could not speak on University property. Thereupon, Wilkinson departed the campus without speaking.

34. Immediately after being turned away from Carroll Hall, Wilkinson and many of the students walked to Hillel House, a building belonging to a religious organization and located about one block from the campus, where Wilkinson spoke. Because of the size of the building, many of the students were turned away without being able to hear the speech.

35. On March 4, 1966, the defendant Sitterson, by letter, denied the request for the plaintiff Aptheker to speak on the campus on the subject of the war in Viet Nam.

36. Shortly after noon on March 9, 1966, more than 1,000 students assembled at McCorkle Place in front of the Confederate Memorial on the campus of the University of North Carolina at Chapel Hill for the purpose of hearing the plaintiff Aptheker, who was present for

the purpose of making a speech on the subject of the war in Viet Nam. When plaintiff Dickson undertook to introduce Aptheker, a police officer, acting on his own initiative and without specific instructions from anyone, but within the scope of his authority as an agent of the defendants, interrupted and stated that if Aptheker spoke he would be breaking the law and would be arrested. The police officer further instructed the plaintiff Dickson that he would prefer charges against him before the Honor Council of the University for deliberately disobeying a directive of Chancellor Sitterson.

37. After being prevented from speaking on University property, Aptheker was escorted to a sidewalk on East Franklin Street in Chapel Hill, outside the boundary of the campus and at approximately the same place Wilkinson had spoken the week before. More than 1,000 students were standing on the campus inside the rock wall. Because of street noises, the lack of amplifiers, and the noise of the crowd, a large number of the students were unable to hear what was said. Aptheker stated that he was unable to maintain a shouting voice that could be heard by any appreciable number of students for a sufficient time to deliver his intended speech on the war in Viet Nam. Instead, he spoke for a few minutes on his opposition to the "Speaker Ban" law and his objection to being denied the right to speak on the campus of the University. Thereafter, the student plaintiffs and members of the organizations sponsoring the invitation to Aptheker attempted to arrange for a public meeting in the vicinity of the campus for a speech by Aptheker on the night of March 9, 1966. After being unsuccessful in a number of attempts to obtain a large church auditorium, the students finally obtained permission for Aptheker to speak at the Community Church, which is on private property and located about one mile from the campus. Because of the size of the church auditorium, Aptheker was forced to make his speech to a limited audience.

38. On March 14, 1966, the plaintiffs Dickson, Nicholson, Powell, Medford, Greenbacker, Van Loon, Waller, and Matthews, individually and purporting to act on behalf of their respective organizations, made a further request in writing to the defendant Sitterson that Aptheker and Wilkinson be permitted to speak on the campus of the University at Chapel Hill. It was requested that Wilkinson be permitted to speak on March 23, and Aptheker be permitted to speak on March 25, 1966. The defendant Sitterson was further requested that if these dates were unsatisfactory, to indicate when Wilkinson and Aptheker might speak on the campus on some subsequent dates in April or May, during the summer session, or during the early fall. All the requirements set forth in the resolutions of the Board of Trustees of February 28, 1966, were complied with in this further request for permission to invite Wilkinson and Aptheker. The dates of March 23 and March 24, 1966, passed without any reply being received. On March 25, 1966, the plaintiff Dickson mailed a letter to the defendant Sitterson advising that he had failed to receive a reply to the request of March 14, 1966, and that he assumed this fact indicated the request had been denied. On March 28, 1966, the defendant Sitterson advised the plaintiff Dickson by letter that the request had "been referred to the joint faculty-student committee for its consideration." On March 29, 1966, Chancellor Sitterson stated that he felt that he needed recommendations from several sources before making a decision in regard to the request submitted by the plaintiff students, and on or about the same date excused the delay in acting upon the request by stating that deciding which speakers would be allowed to talk on the campus was only a small fraction of his work, and that he could not "spend 90 per cent of [his] time considering that single problem."

39. On March 31, 1966, the defendant Sitterson turned down the request of the plaintiff students that Aptheker and Wilkinson be permitted to speak on the

University campus, advising that since the students had already had a chance to hear these speakers he did not believe additional educational purposes would be served by their return during that semester. Chancellor Sitterson further advised the students that two other speakers who would have been barred under the 1963 statute had already appeared and spoken to several classes and to a student group, and that the decision with respect to Aptheker and Wilkinson did "not preclude later consideration of either or both of these individuals or any other proposed invitation by any authorized student group." Thereafter, on March 31, 1966, this action was commenced.

40. The plaintiffs Wilkinson and Aptheker had previously spoken on many university campuses throughout the country on the subjects on which they were invited to speak at the University of North Carolina at Chapel Hill. During the month of March, 1966, they both spoke on these subjects on the campus of Duke University, Durham, North Carolina.

41. The University of North Carolina has hundreds of visiting speakers on its campuses each year, some invited by student organizations and some by faculty groups. The provisions of G.S. § 116–199 and § 116–200, and the regulations and procedures established by the Board of Trustees pursuant to these statutes, do not apply equally to all persons invited to speak at the University, but only to the three classes of persons mentioned in the statutes.

42. The Congress of the United States, as a result of evidence adduced before various committees, has found that the purpose of the Communist movement is to establish a Communist totalitarian dictatorship in the countries throughout the world "by treachery, deceit, infiltration into other groups (governmental and otherwise), espionage, sabotage, terrorism, and any other means deemed necessary," and that Communist organizations, in carrying out their purposes "are organized on a secret, conspiratorial basis and operate to a substantial extent through organizations, commonly known as 'Communist fronts', which in most instances are created and maintained, or used, in such manner as to conceal the facts as to their true character and purposes and their membership." 50 U.S.C. § 781.

43. The plaintiff Aptheker has been a member of the Communist Party of the United States since 1939, and has served on the National Committee of the Communist Party U.S.A. He has been editor of *Political Affairs,* the official theoretical organ of the Communist Party U.S.A., and has made trips to the Soviet Union. In 1965, Aptheker made a trip to North Viet Nam, and upon his return, published a book highly favorable to the North Vietnamese. Bettina Aptheker, who has been a member of the DuBois Club, is Aptheker's daughter.

44. Plaintiff Wilkinson has been convicted of unlawfully refusing to answer inquiries before a sub-committee of the House Un-American Activities Committee before a sub-committee of the inquiries was to determine whether or not he was at any time a member of any Communist Party. By reason of said conviction, Wilkinson served a term in Federal prison.

45. Because Wilkinson has pleaded the Fifth Amendment in refusing to answer any questions with respect to Communist or subversive connections or activities before a duly constituted legislative committee, and because Aptheker admits being a member of the Communist Party of the United States, both are within the classifications set forth in G.S. § 116–199 and § 116–200, and the rules and regulations established by the defendants pursuant to said statutes.

46. Since the passage of G.S. § 116–199 and § 116–200 in their present form, and the adoption on February 28, 1966, of procedures and regulations pursuant to said statutes, three members of the Communist Party have appeared and spoken at the University of North Carolina at Chapel Hill, one upon invitation of a

student group and two upon the invitation of faculty groups. Chancellor Sitterson did not consider the invitations by faculty groups to be subject to the statute.

47. In March of 1966, Chancellor Caldwell, of North Carolina State University at Raleigh, approved invitations extended by student groups to Gus Hall, Chairman of the Communist Party U.S.A., and to Robert Jones, who had pleaded the Fifth Amendment before a congressional committee, to speak on the campus of the University at Raleigh. These invitations, however, were not accepted by the speakers.

## DISCUSSION

This Court is not blind to world affairs, and can understand and appreciate the vital concern of the people of the State of North Carolina over the unregulated appearance of dedicated members of the Communist Party on the campuses of its State-supported institutions. The record in this case clearly establishes that the Communist conspiracy is dedicated to the destruction of freedom, and attempts to achieve its goals of world conquest through discord, deceit and untruths. The record further establishes that the use of college campuses affords the Communist Party with an optimum chance of reaching and influencing a maximum number of young people. Certainly, the State is under no obligation to provide a sanctuary for the Communist Party, or a platform for propagandizing its creed.

■ It is beyond question that boards of trustees of State-supported colleges and universities have every right to promulgate and enforce rules and regulations, consistent with constitutional principles, governing the appearance of all guest speakers. Institutions of higher learning are engaged in the education of students, rather than satisfying their whimsical curiosity. There are undoubtedly many speakers, both as individuals and with respect to the causes they espouse, who add nothing whatever to the educational process. No one has an absolute right to speak on a college or university campus, but once such institution opens its doors to visiting speakers it must do so under principles that are constitutionally valid.

We are also aware that when student groups have the privilege of inviting speakers, the pressure of considerations of audience appeal may impel them to so prefer sensationalism as to neglect academic responsibility. Such apparently motivated the plaintiff students during the spring of 1966. If the offering of the sensational becomes their primary objective, the resulting program may not complement the educational purposes of the university. One does not acquire an understanding of important racial problems by listening successively to a Stokeley Carmichael or an H. Rap Brown and an officer of the Ku Klux Klan. Countering a Herbert Aptheker with an official of the American Nazi Party may furnish excitement for young people, but it presents no rational alternatives and has but dubious value as an educational experience. University students should not be insulated from the ideas of extremists, but there is danger that the voices of reason, throughout the broad spectrum they cover, will remain unheard if the clamor of extremists is disproportionately amplified on university platforms. A more balanced program, unenslaved by sensationalism, but reaching it, too, would not be calculated to evoke legislative response.

■ We do not doubt that the 1963 and 1965 Sessions of the General Assembly, and the Commission appointed to study the vexing problems relating to the appearance of guest speakers, acted in utmost good faith and out of a genuine concern for the welfare of the students enrolled in State-supported institutions. Neither do we doubt the assertion that academic freedom, to be meaningful, demands a high degree of academic responsibility. Nevertheless, gauged by constitutional standards, our view is that the 1965 enactment of G.S. § 116–199 and § 116–200, and the procedures and regulations adopted by the Board of

Trustees on February 28, 1966, pursuant to these statutes, are facially unconstitutional because of vagueness. This is true even though the statutes and regulations, unlike their 1963 counterparts, only regulate, rather than prohibit, the appearance of a special group of speakers.

██ It is firmly established that a statute "which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application * * *" violates the due process clause of the Fourteenth Amendment because of vagueness. Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Moreover, standards of permissible statutory vagueness are particularly strict when First Amendment rights are involved. N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Smith v. People of State of California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). While the question of vagueness has most frequently arisen in criminal prosecutions, it has been applied in a variety of other situations where the obedience to a rule or standard has been exacted. A. B. Small Company v. American Sugar Refining Co., 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589 (1925); Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966).

The first provision of the statute under attack covers a "known member of the Communist Party." "Known" to whom, and to what degree of certainty? "Known" according to what standard? A "member" in what sense? Does it include membership in a Communist "front" organization? Is it a matter of general reputation or rumor, or the personal knowledge of the Chancellor? The statutes and regulations provide no clues to any of these questions. Without such answers, neither those who must obey nor those who must enforce the statutes and regulations can determine the extent of their obligation.

The next provision of the statute requires regulations covering visiting speakers who are "known to advocate the overthrow of the Constitution of the United States or the State of North Carolina." Does it mean with force and arms or is the advocacy of ideas sufficient? Must the advocacy be public or private? Is the advocacy of peaceful change included? It is sufficient to say that reasonable men might differ on the answers to these questions.

The third section of the statute covers speakers who have "pleaded the Fifth Amendment of the Constitution of the United States." Presumably, this means the "self-incrimination" class, although this is a matter of conjecture. What is meant by "subversive connections?" Here again, since reasonable men might differ, the statute is unconstitutionally vague. Moreover, the imposition of any sanction by reason of the invocation of the Fifth Amendment is constitutionally impermissible. Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967).

The statement of policy and the procedures and regulations adopted by the Board of Trustees suffer from the same infirmities. In order to withstand constitutional attack, they must impose a purely ministerial duty upon the person charged with approving or disapproving an invitation to a speaker falling within the statutory classifications, or contain standards sufficiently detailed to define the bounds of discretion. Neither criteria has been met' with respect to the procedures and regulations in question.

Loyalty oaths have recently been declared unconstitutional because of vagueness in the cases of Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) and Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966). In Whitehill v. Elkins, 389 U.S. 54, 88 S.Ct. 184, 19 L.Ed.2d 228 (1967), the Supreme Court, in another teacher oath case, again emphasized the need for "precision and clarity" in the "sensitive and important First Amendment area."

Similarly, in Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), the Supreme Court, in striking down certain New York statutes and administrative regulations dealing with the employment or retention of State employees because of vagueness, stated:

> "There can be no doubt of the legitimacy of New York's interest in protecting its education system from subversion. But 'even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.' Shelton v. Tucker, 364 U.S. 479, 488 [81 S.Ct. 247, 252, 5 L.Ed.2d 231].

> \*  \*  \*  \*  \*  \*

> We emphasize once again that '[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms,' N.A.A.C.P. v. Button, 371 U.S. 415, 438 [83 S.Ct. 328, 340, 9 L.Ed.2d 405]; '[f]or standards of permissible statutory vagueness are strict in the area of free expression. \* \* \* Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.' Id., at 432–433 [83 S.Ct., at 337–338]. New York's complicated and intricate scheme plainly violates that standard. When one must guess what conduct or utterance may lose him his position, one necessarily will 'steer far wider of the unlawful zone \* \* \*.' Speiser v. Randall, 357 U.S. 513, 526 [78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460]. For '[t]he threat of sanctions may deter \* \* \* almost as potently as the actual application of sanctions.' N.A.A.C.P. v. Button, supra [371 U.S.] at 433 [83 S.Ct. at 338]. The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed. See Stromberg v. [People of State of] California, 283 U.S. 359, 369 [51 S.Ct. 532, 535, 75 L.Ed. 1117]; Cramp v. Board of Public Instruction, 368 U.S. 278 [82 S.Ct. 275, 7 L.Ed.2d 285]; Baggett v. Bullitt, supra.

> The regulatory maze created by New York is wholly lacking in 'terms susceptible of objective measurement.' Cramp v. Board of Public Instruction, supra, at 286 [82 S.Ct., at 280]. It has the quality of 'extraordinary ambiguity' found to be fatal to the oaths considered in *Cramp* and Baggett v. Bullitt. '[M]en of common intelligence must necessarily guess at its meaning and differ as to its application \* \* \*.' Baggett v. Bullitt, supra [377 U.S.] at 367 [84 S.Ct., at 1320]. Vagueness of wording is aggravated by prolixity and profusion of statutes, regulations, and administrative machinery, and by manifold cross-references to interrelated enactments and rules."

When the statutes and regulations in question are applied to the unbroken line of Supreme Court decisions respecting the necessity for clear, narrow and objective standards controlling the licensing of First Amendment rights, the conclusion is inescapable that they run afoul of constitutional principles.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and of the subject matter.

2. The plaintiffs are entitled to an order declaring § 116–199 and § 116–200, General Statutes of North Carolina, and the procedures and regulations adopted by the Board of Trustees of the University of North Carolina pursuant thereto, to be unconstitutional and null and void.

3. The plaintiffs are further entitled to an order enjoining the defendants from further acting under said statutes, procedures and regulations.