Elizabeth Ann **DUKE** and David William Haylon,

v.

The **STATE OF TEXAS**, North Texas State University, Crawford Martin, Attorney General of the State of Texas, et al.

**Civ. A. No. 1950.**

United States District Court,
E. D. Texas,
Sherman Division.

May 26, 1971.

Sylvia M. Demarest, Dallas, Tex., Michael J. Whitten, Denton, Tex., for plaintiffs.

Crawford M. Martin, Atty. Gen., Howard M. Fender, Asst. Atty. Gen., Austin, Tex., Jack Q. Barton, City Atty., W. Ralph Mann, John E. Lawhon, Dist. Atty., Denton, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

JUSTICE, District Judge.

This is a suit by two individuals, Elizabeth Anna Duke and David William Haylon, seeking injunctive and declaratory relief against the State of Texas and various of its agents and instrumentalities. In order to delineate clearly the context of the veritable maze of facts and law involved in this case, it is necessary that the relevant statutes, university regulations, and court orders be set out in the margin.[1]

---

1. Article 2651a, Vernon's Ann.Civ.St. of Texas

"Section 1. * * * said University * * * shall be conducted, operated and maintained under the general direction and supervision of a * * * separate Board of Regents as herein provided.

"Sec. 2. The organization, control and management of said College shall be vested in a Board of Regents * * *."

Article 2919j, Vernon's Ann.Civ.St. of Texas

"Section 1. All of the general and criminal laws of the state are declared to be in full force and effect within the areas under the control and jurisdiction of the state institutions of higher education of this state.

"Sec. 2. * * * Any person who violates any of the provisions of this Act or any rules or regulation of any governing board of any state institution of higher education of this state promulgated under the authority of this Act shall upon conviction thereof be punished by a fine of not more than $200.

* * * * *

"Sec. 4. It shall be unlawful for any person to trespass upon the grounds of any of the institutions of higher education of this state or to damage or deface any of the buildings, statutes, monuments, memorials, trees, shrubs, grasses or flowers on the grounds of any of the state institutions of higher education.

* * * * *

"Sec. 8. The judge of a municipal court or any justice of the peace of any city or county where property under the control and jurisdiction of state institutions of higher education of this state is located is each hereby separately vested with all jurisdiction necessary to hear and determine criminal cases involving violations hereof where the punishment does not exceed a fine of $200.

"Sec. 9. The governing boards of the respective state institutions of higher education or their authorized representatives shall be vested with authority to refuse to allow persons having no legitimate business to enter upon any property under the control and jurisdiction of any state institution of higher education of this state and to eject any undesirable person from said property upon their refusal to leave peaceably upon request. Authority is given to require identification of any person upon the property of any of the state institutions of higher education.

"Sec. 10. Notwithstanding any of the provisions of this Act, all officers com-

missioned by the governing boards of the respective state institutions of higher education of this state may be authorized and empowered by the respective board to enforce rules and regulations promulgated by the Board. Nothing herein is intended to limit or restrict the authority of each institution to promulgate and enforce appropriate rules and regulations for the orderly conduct of the institution in carrying out its purposes and objectives or the right of separate jurisdiction relating to the conduct of its students and personnel."

Article 466a, Vernon's Ann.Penal Code of Texas

"Section 1. Every person who, at a time and place and under circumstances reasonably calculated to produce a clear and present and immediate threat or danger to the physical well-being, property or life of another, knowingly and willfully commits an act, or urges another to commit an act, so calculated and tending to produce injury or damage to the property, person or life of another person, shall be guilty of a misdemeanor punishable by a fine of not more than $2,000, or a jail sentence of not more than two (2) years, or by both such fine and jail sentence.

"Sec. 2. In all cases where such actions are threatened, the State by and through its County or District Attorney, may have injunctive relief as an additional sanction against all who are so threatening to commit such unlawful act or acts. Where such actions are threatened in, on, or against any state agency, or property thereof, the Attorney General may institute such proceedings. All such injunctive proceedings shall be in the name of the State of Texas and be guided by the rules of other injunction proceedings. No bond shall be required."

Campus Security Regulations [at North Texas State University].

"3. The President and his designated officials are authorized to:

 \* \* \* \* \*

g. Refuse to allow persons having no legitimate business to enter upon the property under the control and jurisdiction of the University, and to eject any undesirable person from said property upon their refusal to leave peaceably upon request. Authority is given to require identification of any person upon such property and to enforce Section 4 of S.B. 162 [Article 2919j, Vernon's Ann. Civ.St. of Texas], which provides that it is unlawful for any person to trespass upon the grounds of the University or to damage or deface any of the buildings, statutes, monuments, memorials, trees, shrubs, grasses or flowers on the grounds."

Speakers Sponsored by Student Groups [at North Texas State University].

"1. A university is a forum for the scrutiny and exchange of ideas. Therefore, North Texas State University encourages student organizations to invite speakers on the campus. Limitations upon speakers' appearances are warranted only in order to preserve an organized society in which peaceful, democratic means for the examination and discussion of ideas are available.

2. The Dean of Students must approve all arrangements for speakers sponsored by student groups.

3. The distinction between advocacy of abstract doctrines and advocacy directed at promoting unlawful action is recognized; therefore, the speaker must not urge the audience to take action illegal under federal, Texas, or local law. Advocating or urging action to effect the modification of the government of the United States or the State of Texas by violence or sabotage is specifically prohibited. It is the responsibility of student organizations to inform speakers of these prohibitions.

4. Student organizations that invite speakers assume the responsibility for taking reasonable steps to assure comliance with paragraph 3 above. Violators of this responsibility may be disciplined under established rules for the violation of University regulations.

5. Any student or student organization convinced in good faith that arbitrary or unreasonable limitations have been imposed on the appearance of off-campus speakers, or any student or student organization subjected to disciplinary action under the provision of this policy, may appeal to a student-faculty committee or review to be appointed by the President.

6. Speakers, rather than the University, are responsible for the views they express."

Extra Curricular Use of Facilities [at North Texas State University].

"It is therefore necessary for all functions which require the use of institutional buildings to receive the approval of the Associate Dean of Students and for the appropriate facility to be scheduled and reserved through that office well in advance. For the same reason, certain policies are also established to cover activities taking place on the grounds of the campus, outside of any buildings or structures.

"Requests for approval of functions and for facilities must be made on the official forms provided. All questions must be answered and the request presented a minimum of *five* days prior to the desired date of use. In all instances, the final acknowledgement of a reservation must come from the Associate Dean of Students.

"Sponsoring organizations assume full responsibility for any financial obligations, damage to facilities or equipment, actions of participants, and shall have read and acknowledged the Code of Student Conduct and the University Speaker Policy. Standard charges will be set by the University.

\* \* \* \* \*

"Requests for reservations must be cleared through the Associate Dean of Students.

\* \* \* \* \*

"Individuals who are neither students nor employees of the University may, in general, be invited by the sponsoring group to attend activities scheduled by any of the types of groups listed above. The phrase 'invited to attend' means that the nonstudent is part of the general public to which the occurrence is open, or that he is part of a specific class of persons to which a general invitation has been extended, or that he has been specifically invited to be present by the sponsor group. \* \* \* Nothing in this policy shall be contrued to limit the authority conveyed to the University by Article 2919j, Texas Annotated Statutes, or by the state law governing disruptive activities. (Vernon's Ann.P.C. Art. 295a).

"In the event there is reasonable evidence to suggest that the presence at an occurrence on University facilities of nonstudents would lead to violence, disruption of University functions, abuse of persons or property, or violation of Texas statutes, then the President of the University or his designated delegate may close the occurrence to nonstudents, who shall then not be permitted to attend. Such closure shall not affect the right of peace officers or news media representatives (as defined and regulated in paragraph 3 above) to be present at the occurrence. This paragraph shall not affect the person or persons who are, or are part of, the program scheduled for the occurrence.

"In the event that the conduct of any nonstudent present at any such occurrence has become violent, unlawful, disruptive of University functions or abusive of persons or property, or in the event that there is a clear and present danger that the conduct of any nonstudent present at any such occurrence will become violent, unlawful, disruptive of University functions or abusive of persons or property, then the President of the Univerity or his designated delegate shall order such nonstudent to leave the University's buildings and/or grounds immediately. Such an order shall have the legal effect of immediately rescinding any invitation to be present at the occurrence which was issued by the sponsor of the occurrence. Any nonstudents who refuse to obey the order shall be subject to legal action as trespassers on the University's facilities.

"Primary responsibility for the conduct of nonstudents invited to attend any occurrence rests upon the sponsor of the occurrence. In the case of registered student organizations, the organization and its members are subject to the Code of Student Conduct.

\* \* \* \* \*

"It is presumed that groups of students will naturally congregate in outdoor areas of the University campus for recreational and social purposes, for pep rallies, for informal discussions, etc. It is not the intent of the University to restrict such gatherings. Advance approval of such gatherings is not required unless one or more of the following conditions prevail:

\* \* \* \* \*

"2. Nonstudents are to be invited to the gathering.

\* \* \* \* \*

"In the event that any of these conditions prevail, then the previously cited regulations for the use of buildings will be in effect and thereby limit the use of the grounds to recognized student organizations."

Bylaws of the Board of Regents of North Texas State University

"Article III Administration of the University

"Section 1. The President; Duty to the University

\* \* \* \* \*

"b. Any authority or responsibility of the President may be delegated by him to any member of the faculty or staff of the University. Delegation of major areas of authority or responsibility shall have the prior consent of the Board of Regents."

Temporary Restraining Order of the District Court of Denton County, 158th Judicial District of Texas

"\* \* \* it is therefore ORDERED, ADJUDGED and DECREED that de-

From all the evidence, testimony and exhibits, adduced upon the trial of this case on May 5 and 6, 1971, I find that the following events occurred on the dates shown:

FEBRUARY 9, 1971:

Herb Ninness, a student at North Texas State University, discussed with plaintiff David Haylon, a non-student, and with plaintiff Elizabeth Duke, a non-student, the holding of a rally on February 17, 1971, on the campus of North Texas State University, to protest certain military activities in Southeast Asia, the obtaining of sponsorship for the rally by the United Students of North Texas, and the presence of both plaintiffs to make speeches at the rally.

The Student Senate passed a resolution, designated Bill No. DEM 46, to "support" the rally planned for February 17 for the "purpose of educating the people as to U. S. involvement in S.E. Asia."

FEBRUARY 10, 1971:

Ninness, a member of the Student Senate, but not formally authorized to act in this matter, approached the Vice President for Student Affairs, William Lindley, regarding the use of university facilities and the appearance of outside speakers at the scheduled rally. Vice President Lindley informed Ninness that his request was a matter for the President's Cabinet, and that the Cabinet would be meeting the following day, at which time the request could be presented.

FEBRUARY 11, 1971:

Ninness told the President's Cabinet that the Student Senate had voted to "support" the rally. The Cabinet thereafter denied the request for outside speakers to be allowed at the scheduled rally, because it was not "sponsored" by the Senate or any other recognized campus organization.

FEBRUARY 12, 1971:

Ninness advised Vice President Lindley that he was withdrawing his request and would have no further connection with the appearance or sponsorship of outside speakers at the scheduled rally,

fendants be and they are hereby restrained from:

"(A) Coming onto any of the property owned and controlled by North Texas State University and from coming into any of the buildings or facilities on the campus of North Texas State University; (B) Obstructing the use, enjoyment, ingress or egress of the facilities and buildings of North Texas State University; (C) Committing assault or injuries upon any persons at any of the facilities or on any property of North Texas State University; (D) Damaging or injuring any property whatsoever of North Texas State University; (E) Urging other persons to commit an act calculated intending to produce injury or damage to property, person, or life of other people and insighting [sic] any person to participate in any riot or civil disturbance; (F) Participating in and insighting [sic] mob violence, rioting disturbance and urging other persons to participate in and incite violence, rioting and civil disturbance; (G) Disrupting the normal educational and social activity of North Texas State University or urging other persons to commit any act calculated intending to disrupt the normal educational and social activities of North Texas State University."

Permanent Injunction of the District Court of Denton County, 158th Judicial District of Texas

" * * * and the Court being of the opinion that whereas constitutional questions could be raised on appeal and no emergency existed to necessitate a ruling by the Court on any constitutional question, the Court made no ruling relative thereto; and the Court finding that a permanent injunction should issue, the same is hereby issued, and

"It is ORDERED, ADJUDGED and DECREED that the Defendants David Haylon and Betty Ann Duke, be, and they are each hereby permanently enjoined from, and that each of them shall desist from coming onto or remaining on any of the property owned and controlled by North Texas State University and from coming into any of the buildings or facilities on the campus of North Texas State University for the purpose of addressing student assemblies or for any purpose without first complying with university regulations * * * "

because he did not wish to be held personally responsible for the rally.

FEBRUARY 16, 1971:

Before noon, Vice President Lindley instructed the Chief of Security Police, Tom Martin, to seek legal advice concerning the possibility of obtaining injunctive relief against the plaintiffs. Chief Martin afterwards consulted with the City Attorney of Denton, the Honorable Jack Barton, who conferred with the County and District Attorney of Denton County, the Honorable John Lawhon, and an Assistant Attorney General, the Honorable Jay Floyd. Barton then drafted a proposed application for injunctive relief, which was never used.

Plaintiff Haylon consulted an attorney, Bruce Davis, Esquire, regarding the constitutional standards governing his appearance at the scheduled rally for the purpose of speaking. During the evening, Haylon stated in a radio interview on station KNTU that it was intended that the scheduled rally should proceed in a peaceful manner.

At the regular meeting of the Student Senate, President Jimmy Deming announced his veto of DEM 46. The Senate then passed a resolution, designated Bill No. DEM 49, "sponsoring" certain speakers at the rally planned for the next day, including "two representatives of the People's Community Center of Denton", that is, the plaintiffs. At some time thereafter, President Deming vetoed DEM 49. Appearing before this regular meeting of the Student Senate, Vice President Lindley read from the university policy concerning "Speakers Sponsored by Student Groups" and the policy adopted by the Board of Regents regarding "Extracurricular Use of Facilities" and discussed various provisions of these policies, including the imposition of disciplinary sanctions upon the sponsors of an event for the conduct of non-students invited by them to that event.

FEBRUARY 17, 1971:

In the morning, an Assistant Attorney General in Austin, Texas, dictated a standard form for an application for in-

junctive relief via long distance telephone to a member of the staff of the County Attorney's office, where it was taken down in shorthand and transcribed. This form was revised so as to fit the facts of the situation and readied for presentation to the District Court of Denton County, 158th Judicial District.

The President's Cabinet met in a special session to consider the request of some student proponents of the scheduled rally to allow the outside speakers without regard to compliance with applicable university regulations, but the request was denied. The Acting President of North Texas State University orally authorized Chief Martin to secure injunctive relief.

After 11:00 A.M., the completed application and accompanying affidavit were presented to the Honorable Robert Scofield, District Judge of Denton County, 158th Judicial District. Following a brief *ex parte* hearing, Judge Scofield granted a temporary restraining order against plaintiffs.

Around 12:00 noon, the scheduled rally began. Near 12:30 P.M., the temporary restraining order was served on plaintiff Duke at the scene of the rally on the campus. Both plaintiffs subsequently spoke, Mrs. Duke reading the application, and they remained at the rally until about 2.30 P.M. The rally proceeded without incident after service of the temporary restraining order upon Mrs. Duke.

FEBRUARY 18, 1971:

In the morning, plaintiff Haylon was served, and both plaintiffs were arrested for contempt and incarcerated. In the afternoon, a writ of attachment for contempt was issued.

MARCH 4, 1971:

After a hearing held on February 24, February 26, and March 4, 1971, Judge Scofield granted a permanent injunction against the plaintiffs. He found plaintiff Duke guilty and plaintiff Haylon not guilty of contempt by being at the scheduled rally, but Haylon was found

guilty of contempt for trespassing on university property on a later date.

**MARCH 26, 1971:**

Judge Scofield signed the order granting the permanent injunction.

■ The plaintiffs contend that:

(1) The temporary restraining order issued by the District Court of Denton County, 158th Judicial District, was improper under the Texas Rules of Civil Procedure,[2] for which they seek declaratory relief;

(2) The issuance of the temporary restraining order, *ex parte* and without notice, was violative of their rights under the First and Fourteenth Amendments, for which they seek declaratory relief;

(3) The university's policies concerning outside speakers do not conform to standards consistent with the First and Fourteenth Amendments, for which they seek declaratory and injunctive relief;

(4) Campus Security Regulation 3g, adopted pursuant to Section 9 of Article 2919j, is unconstitutional, because it is both vague and overbroad, for which they seek declaratory and injunctive relief;

(5) In the circumstances of this case, Article 466a was unconstitutionally applied to plaintiffs Haylon and Duke, for which they seek declaratory relief; and

(6) The permanent injunction issued by the District Court of Denton County, 158th Judicial District, violates the First and Fourteenth Amendment rights of the plaintiffs, for which they seek injunctive relief.

Since all of the plaintiffs' contentions implicate the First and Fourteenth Amendments, some preliminary observations are appropriate. At this point in history, there can be no doubt that the Fourteenth Amendment made applicable to the States the full panoply of First Amendment guarantees. Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), cases cited in Schneider v. State, 308 U.S. 147, at 160 (Footnote 8), 60 S.Ct. 146, 84 L.Ed. 155 (1939), and Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). In the case by case exposition that has occurred over the past half-century, the Supreme Court has developed the view that the freedom of expression protected against abridgement by State, as well as by federal government, action

"was not merely a guarantee of a personal liberty to the individual, but was essential to the very existence of the American form of democratic society. This theory, that freedom of expression is of 'super' importance not merely to the individual but to society as a whole, had existed since the beginnings of the federal government and was perhaps the prime motive for inclusion of freedom of speech in the Bill of Rights. The concept is premised upon the supposition that the rights to assemble and to express fully their views give all citizens the opportunity to participate in the democratic process. These rights, the theory goes, assure a full dissemination and discussion of all ideas, and this produces two vital results: rational judgment by the majority on the essential issues and an outlet for the views of the dissenters. The dissenters with such an outlet are more likely to continue their dissent within, rather than without, the democratic process; the peaceful dissent of one day thus may become the peaceful change of the next. The result is a balance between stability and change in the society and the democratic process of the society can be made to survive. Hence freedom of expression must be regarded as the most important of all constitutional guarantees and is entitled to 'super' protection by the Court." Frank L. Maraist, "Federal Injunctive Relief Against State Court Proceedings: The Significance of Dombrowski", 48 Tex.L.Rev. 3, at

---

2. This is a question which should properly be left to a determination by the Texas judiciary.

554 (February 1970). Cf. Machesky v. Bizzell, 414 F.2d 283, at 289–290 (5th Cir. 1969), and Sheridan v. Garrison, 415 F.2d 699, at 706–707 (5th Cir. 1969).

Professor Charles Alan Wright ably elucidated the current status of First Amendment freedoms in the not so cloistered halls of academe in "The Constitution on the Campus", Oliver Wendell Holmes Lectures, delivered at Vanderbilt University School of Law, April 1969, reprinted in 22 Vanderbilt L.Rev. 5, at 1043 (October 1969), when he concluded that

> "the first amendment imposes on the state university fully as much as on the state itself, these three rules: (1) Expression cannot be prohibited because of disagreement with or dislike for its contents. (2) Expression is subject to reasonable and nondiscriminatory regulations of time, place, and manner. (3) Expression can be prohibited if it takes the form of action that materially and substantially interferes with the normal activities of the institution or invades the rights of others."

More specifically,

> "[t]he only justification for licensing rules is to permit implementation of the rules of time, place, and manner. They cannot be the cloak for censorship of content. Some kinds of regulations of time and place are obviously necessary as a form of 'traffice control.'
>
> \* \* \* \* \* \*
>
> "The nature of the university, and the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable, but the first amendment is no bar to reasonable regulations of that kind.
>
> \* \* \* \* \* \*
>
> "Neither the state in general, nor the state university in particular, is free to prohibit any kind of expression because it does not like what is being said. Reasonable and nondiscriminatory regulations of time, place, and manner are the only restrictions that can be put on expression. Action is quite different. It carries no first amendment shield and can be regulated in any way that the public health, safety, morals, and welfare require." Wright, supra, at 1044, 1042, 1039.

Professor Wright finds the most useful analysis of the meaning of the First Amendment in the writings of Thomas I. Emerson.

> "[T]he essence of a system of freedom lies in the distinction between expression and action. The whole theory rests upon the general proposition that expression must be free and unrestrained, that the state may not seek to achieve other social objectives through control of expression and that attainment of such objectives can and must be secured through regulation of action." Emerson, Toward A General Theory of the First Amendment, at 115 (1966).

> "To some extent expression and action are alway mingled; most conduct includes elements of both. Even the clearest manifestations of expression involve some act, as in the case of holding a meeting, publishing a newspaper, or even merely talking. At the other extreme, a political assassination includes a substantial measure of expression. The guiding principle must be to determine which element is predominant in the conduct under consideration. Is expression the major element and the action only secondary? Or is the action the essence and the expression incidental? The answer, to a great extent, must be based on a common sense reaction, made in light of the functions and operations of a system of freedom of expression." Emerson, "Freedom of Expression in Wartime", 116 U.Pa.L.Rev., at 975, 996–997 (1968).

In the instant case, there was not even any conduct such as picketing, parading, or demonstrating, which are themselves methods of expression, entitled to First Amendment protection. At issue here was whether two non-students could

speak to a planned gathering on the campus. The evidence establishes that the overwhelming element of the conduct sought to be proscribed was expression, not action. See *Wright*, supra, at 1050 et seq.

The issues raised by plaintiffs' contentions will be discussed seriatim.[3]

■ (2) Carroll v. President and Commissioners of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968), conclusively establishes that, where principles guaranteed by the First Amendment (applicable to the States by the Fourteenth Amendment) are involved, there is no place for an *ex parte* restraining order, issued without notice to petitioners, where no showing is made that it was impossible to notify the opposing parties and give them an opportunity to participate in any adversary proceeding. The representatives of North Texas State University and the State of Texas had known since February 10, 1971, of the probability that non-student or off-campus speakers, including the plaintiffs, would appear at the rally scheduled for February 17. On February 16, officials of North Texas State University and the State of Texas were making preparations to seek injunctive relief against plaintiffs Haylon and Duke, whose place of residence, directly across the street from the office of the campus security police, they were aware of, as indicated by testimony and in the Application for Temporary Restraining Order itself; yet the officials made no effort to contact petitioners, nor did they offer any excuse for their failure to do so.

■ The rule announced in Walker v. City of Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967), that petitioners could not bypass orderly judicial review of injunctive action against them before disobeying it, is not applicable to the scheduled rally, because the plaintiffs were already on the campus

when plaintiff Duke was served. In other words, she was already in violation of provision (A), which prohibited her from "[c]oming onto any of the property owned and controlled by North Texas State University and from coming into any of the buildings or facilities on the campus of North Texas State University"; and there is not even an intimation that she violated provision (B), (C), (D), (E), (F), or (G). However, plaintiff Haylon's later incursion on the campus would seem to be governed by *Walker*.

■ Moreover, the order, especially provision (A), constituted a prior restraint and is overbroad.[4]

■ (3) North Texas State University's outside speaker regulations, evidenced by the two policy statements set out above,[5] only partially conform to the standards approved by a three-judge district court of the Fifth Circuit in Stacy v. Williams, 306 F.Supp. 963 (1969). Based on the policies set out in "Speakers Sponsored by Student Groups" and "Extracurricular Use of Facilities," as well as the facts of this case, the University's regulations seem deficient in the following particulars: (A) by not having a provision, such as that in paragraph (3) of the *Stacy* Appendix, providing that a request for an outside speaker not acted on in four days will be considered granted; (B) because the policy enunciated in paragraph 3 of "Speakers Sponsored by Student Groups" does not adequately define impermissible advocacy—that is, conduct in which the element of action predominates over that of expression— as is done in paragraph (4) of the *Stacy* Appendix, and especially in Footnote 1 thereto;[6] (C) though the policy referred to in paragraph 5 of "Speakers Sponsored by Student Groups" purportedly creates a student-faculty review committee, the evidence revealed that no such committee had ever been created and, moreover, no adequate pro-

---

3. Excluding contention (1).

4. See the discussion below of plaintiffs' contentions (6) and (4).

5. See Footnote 1.

6. See the quotations above from Wright and Emerson.

cedures, such as those set out in paragraph (5) of the *Stacy* Appendix, have been established; (D) the policies established by "Speakers Sponsored by Student Groups" and "Extracurricular Use of Facilities" place the responsibility for any violation of law arising from a meeting with an outside speaker on the sponsoring organization and its members, rather than on the speaker himself, as paragraph (6) of the *Stacy* Appendix requires; and (E) lack of clarity as to which administrative officer is to approve an invitation to an outside speaker, *i. e.*, "Speakers Sponsored by Student Groups" refers to the Dean of Students, whereas "Extracurricular Use of Facilities" makes reference to the Associate Dean; and in the instant case, the Vice President for Student Affairs and the President's Cabinet apparently assumed authority. Furthermore, the evidence presented raised some doubts as to whether the University policies, and the forms necessary to implement them, were adequately available to students and the general public.

In addition, there was undisputed evidence that certain politicians recently appeared on campus without having been subject to any of the university's regulative processes. And, there was some indication that outside organizations have used university facilities.

"Perhaps a university might bar all off-campus speakers, but the issue is hardly worth pursuing since no educational institution worthy of the name can or does follow such a policy. Once some speakers have been allowed, others may not be turned away 'according to the orthodoxy or popularity of their political or social views', for to do so is 'blatant political censorship.' * * It is not only the speaker invited by campus group who must be tolerated. A university can have a rule limiting the use of college premises to those invited by student groups, faculty members, or the administration, but if it has a practice of making its facilities available to outside organizations, it cannot refuse the facilities to those or-ganizations or speakers it does not like." Wright, supra, at 1050–1051.

See also Synder v. Board of Trustees of the University of Illinois, 286 F.Supp. 927 (N.D.Ill.1968) (three-judge court); Smith v. University of Tennessee, 300 F. Supp. 777 (E.D.Tenn.1969) and Brooks v. Auburn University, 296 F.Supp. 188 (M.D.Ala.1969) aff'd 412 F.2d 1171 (5th Cir. 1969). Also to the point are University Committee to End the War in Viet Nam v. Gunn, 289 F.Supp. 469 (W. D.Tex.1968) (three-judge court), appeal dism'd for want of jurisdiction 399 U.S. 383, 90 S.Ct. 2013, 26 L.Ed.2d 684 (1970); and New Left Education Project v. Board of Regents of the University of Texas System, 326 F.Supp. 158 (W.D.Tex.1970) (three-judge court).

■■ (4) The operative language of Campus Security Regulation 3g, and of Section 9 of Article 2919j as well, is "persons having no *legitimate* business * * * [and] any *undesirable* person." [Emphasis added.] That the emphasized words do not give the fair notice of proscribed conduct required by the Due Process Clause and that they give unbridled discretion to administrative officials is evident. The following quotation from Dickson v. Sitterson, 280 F. Supp. 486, at 498–499 (M.D.N.C.1968) (three-judge court), states clearly the standards for testing vagueness.

"It is firmly established that a statute 'which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application * * *' violates the due process clause of the Fourteenth Amendment because of vagueness. Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Moreover, standards of permissible statutory vagueness are particularly strict when First Amendment rights are involved. N. A. A. C. P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Smith v. People of State of California, 361 U.S. 147, 80 S.Ct.

215, 4 L.Ed.2d 205 (1959). While the question of vagueness has most frequently arisen in criminal prosecutions, it has been applied in a variety of other situations where the obedience to a rule or standard has been exacted. A. B. Small Company v. American Sugar Refining Co., 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589 (1925); Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966).

\* \* \* \* \* \*

"Loyalty oaths have recently been declared unconstitutional because of vagueness in the cases of Baggett v. Bullit, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) and Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966). In Whitehill v. Elkins, 389 U.S. 54, 88 S.Ct. 184, 19 L.Ed.2d 228 (1967), the Supreme Court, in another teacher oath case, again emphasized the need for 'precision and clarity' in the 'sensitive and important First Amendment area.' Similarly, in Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), the Supreme Court, in striking down certain New York statutes and administrative regulations dealing with the employment or retention of State employees because of vagueness, stated:

'There can be no doubt of the legitimacy of New York's interest in protecting its education system from subversion. But "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." Shelton v. Tucker, 364 U.S. 479, 488 [81 S.Ct. 247, 252, 5 L.Ed.2d 231].

\* \* \* \* \* \*

'We emphasize once again that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms," N. A. A. C. P. v. Button, 371 U.S. 415, 438 [83 S.Ct. 328, 340, 9 L.Ed.2d 405]; "[f]or standards of permissible statutory vagueness are strict in the area of free expression. \* \* \* Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." Id., at 432–433 [83 S.Ct., at 337–338]. New York's complicated and intricate scheme plainly violates that standard. When one must guess what conduct or utterance may lose him his position, one necessarily will "steer far wider of the unlawful zone \* \* \*." Speiser v. Randall, 357 U.S. 513, 526 [78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460]. For "[t]he threat of sanctions may deter \* \* \* almost as potently as the actual application of sanctions." N. A. A. C. P. v. Button, supra [371 U.S.] at 433 [83 S.Ct. at 338]. The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed. See Stromberg v. [People of State of] California, 283 U.S. 359, 369 [51 S.Ct. 532, 535, 75 L.Ed. 1117]; Cramp v. Board of Public Instruction, 368 U.S. 278 [82 S.Ct. 275, 7 L.Ed.2d 285]; Baggett v. Bullit, supra.

'The regulatory maze created by New York is wholly lacking in "terms susceptible of objective measurement." Cramp v. Board of Public Instruction, supra, at 286 [82 S.Ct., at 280]. It has the quality of "extraordinary ambiguity" found to be fatal to the oaths considered in *Cramp* and Baggett v. Bullit. "[M]en of common intelligence must necessarily guess at its meaning and differ as to its application \* \* \*." Baggett v. Bullit, supra [377 U.S.] at 367 [84 S.Ct., at 1320]. Vagueness of wording is aggravated by prolixity and profusion of statutes, regulations, and administrative machinery, and by manifold cross-references to interrelated enactments and rules.'

"When the statutes and regulations in question are applied to the unbroken line of Supreme Court decisions respecting the necessity for clear, narrow and objective standards controlling the licensing of First Amendment rights, the conclusion is inescapable that they run afoul of constitutional principles."

■ With regard to overbroadness, it only needs to be noted that

"a statute regulating in the area of freedom of expression that is unconstitutionally vague is necessarily overbroad for either of two reasons: (1) the legislature could have used less restrictive means—a more precise statute—and (2) the vagueness of the language, reaching into the first amendment area, makes it susceptible of interpretation in a manner that infringes upon first amendment freedoms. Thus a vague statute in the first amendment area is necessarily overbroad, while the converse is not true: a narrowly drawn, specific statute might still overbroadly infringe upon first amendment rights." *Maraist*, supra, at 559.

On the basis of these criteria, it is impossible to avoid the conclusion that Campus Security Regulation 3g and Section 9 of Article 2919j [7] abut upon the critical area of First Amendment freedoms; both impose standards so vague that men of common intelligence must necessarily guess at their meaning, and they also fail to delineate distinctly between permissible and impermissible conduct. Furthermore, the lack of precision or clarity makes those standards susceptible of oppressive or capricious application; and the action which may be the legitimate object of legislative and administrative restriction could have been reached by more narrowly drawn limitations.

(5) The plaintiffs do not challenge the constitutionality of Article 466a of the Texas Penal Code, but rather contend that it was unconstitutionally applied to them under the facts in this case. Speaking for a three-judge court, Judge Ingraham recently held Article 466a to be neither vague nor overbroad and therefore constitutional on its face. Locke v. Vance, 307 F.Supp. 439 (S.D. Tex.1969). Article 466a sets a "clear and present and immediate threat or danger" as the standard for criminal or injunctive relief, respectively, against a person who either commits or threatens to commit, or who either urges or threatens to urge another to commit, acts "calculated and tending to produce injury or damage to the property, person or life of another person."

In the original application for temporary restraining order filed in the District Court of Denton County, 158th Judicial District, it is alleged that the presence of plaintiffs Haylon and Duke on the campus would constitute a clear and present danger of disruptive activity. However, the evidence adduced both during the hearing for a permanent injunction in the State court and in this court is devoid of any facts which would substantiate this allegation.

■ At the hearing in this court, university officials testified that the reason they sought the temporary restraining order from the State court was the intended participation by the plaintiffs in the scheduled rally, despite the fact that they were not properly sponsored by a student organization. In and of itself, the lack of proper sponsorship, especially in the absence of constitutional speaker regulations, is not a sufficient basis for invoking the sanctions of Article 466a. In the application itself, reference was made to Article 2919j [8] and to Campus Security Regulation 3g as the basis for the issuance of the temporary restraining order, but these are likewise not an appropriate basis for using Article 466a.

Moreover, the State failed to prove its assertion in the application that

---

7. See the discussion below of plaintiffs' contention (5).

8. Mistakenly referred to therein as Article 4419A.

plaintiffs Haylon and Duke made any significant contribution to allegedly disruptive activity that may have taken place at the Administration Building at North Texas State University on September 23, 1970. The plaintiffs' uncontradicted testimony indicates that Mrs. Duke was inside at a meeting concerning the status of her employment during most of the events of that day, and that Haylon was cooperative with university officials and was not even present during most of the events of that day.

Finally, the evidence regarding the actual events of the February 17 rally, including segments of a video tape taken by campus police, shows no conduct on the part of plaintiffs Duke or Haylon that would bring them within the purview of Article 466a. As Justice Holmes said over half a century ago, "the character of every act depends upon the circumstances in which it is done." Schenck v. United States, 249 U.S. 47, at 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919). And the circumstances of this rally, far from seriously portending violence, bespeak a considerable lack of enthusiasm from most of those present. The only incident which caused any appreciable activity was the action of the Sheriff of Denton County and a Deputy Sheriff in serving Mrs. Duke with the temporary restraining order.

■ (6) The permanent injunction[9] issued by the State district court judge is a blanket prohibition against plaintiffs Haylon and Duke from going onto the university campus. This prohibition appears to be a direct abridgement of First Amendment rights, guaranteed against State action by the Fourteenth Amendment, specifically, a disfavored prior restraint on the exercise of those freedoms. See, e. g., Bantam Books, Inc. v. Sullivan, 372 U.S. 58, at 70, 83 S.Ct. 631, 9 L.Ed. 2d 584 (1963) and cases cited therein. The injunction is patently overbroad, as revealed by language from *Carroll*, supra, 393 U.S. at 183–184, 89 S.Ct. at 353, and as hereafter shown, even assuming

it was directed at a substantial evil which the State has a right to prevent; for

"[a]n order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order. In this sensitive field, the State may not employ 'means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.' Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). In other words, the order must be tailored as precisely as possible to the exact needs of the case."

The prior restraint here in issue is particularly offensive, since it is cojoined with the admonition to comply with relevant university regulations, all of which are constitutionally defective. Moreover, the restrictions on protected First Amendment speech and related rights which were involved in King v. Jones, 319 F.Supp. 653 (N.D.Ohio 1970) and Machesky v. Bizzell, 414 F.2d 283 (5th Cir. 1969) were not nearly so onerous as those attempted by this State court's permanent injunction.

■ Indeed, the judgment[10] of the State district court recites that the judge has not given any consideration to the constitutional questions raised. It is critical to the vitality of our federalism that State court judges, as well as the national government's judiciary, are obligated to apply the Constitution to the facts and the law in the cases before them. Article 6, Clause 2, Constitution of the United States. The failure and refusal of the State district judge to rule on the constitutional issues, which were squarely presented to him, presents an abuse of judicial discretion of such magnitude as to amount to a denial of the most fundamental element of the Due Process Clause of the Fourteenth Amendment—the right to a full and fair hearing—and to a denial of the equal pro-

9. See Footnote 1.

10. See Footnote 1.

tection of the laws. Cf. Monroe v. Pape, 365 U.S. 167, at 180, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

Now, I turn to the defendants' motion to dismiss for lack of jurisdiction. The defendants contend that 28 U.S.C.A. § 2283 deprives this court of jurisdiction to enjoin enforcement of the State court's injunction. Section 2283 provides that:

> "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgment."

The plaintiffs, however, contend that 42 U.S.C.A. § 1983 is an "expressly authorized" exception to Section 2283. Section 1983 provides that:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action of law, suit in equity, or other proper proceeding for redress."

Jurisdiction for seeking such redress for violations of the Civil Rights Act of 1871 is lodged in the federal district courts. See 28 U.S.C.A. § 1343(3) and (4).

Initially, defendants urge that Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its companion cases, demonstrate that the Supreme Court would look unfavorably on an injunction by this Court against enforcement of the State court's injunction. But Justice Black's majority opinion makes clear that the Court's decision in Younger, supra, at 54, 91 S.Ct. at 755, conveys nothing about Section 2283 itself.

> "Because our holding rests on the absence of factors necessary under equitable principles to justify federal intervention, we have no occasion to consider whether 28 U.S.C. § 2283, which prohibits an injunction against state court proceedings 'except as expressly authorized by Act of Congress' would in and of itself be controlling under the circumstances of this case." Cf. the concurring opinion of Justices Stewart and Harlan at 54, 91 S.Ct. at 756.

The holding of Younger is merely the logical extension of comity principles regarding threatened state criminal prosecutions to pending state criminal prosecutions.

> "Notwithstanding the authority of the district court, as a federal court, to hear and dispose of the case, petitioners are entitled to the relief prayed only if they establish a cause of action in equity. Want of equity jurisdiction, while not going to the power of the court to decide the cause, * * may nevertheless, in the discretion of the court, be objected to on its own motion. * * * Especially should it do so where its powers are invoked to interfere by injunction with threatened criminal prosecutions in a state court." Douglas v. City of Jeannette, 319 U.S. 157, at 162, 63 S.Ct. 877, 880, 87 L.Ed. 1324 (1943).

The rationale supporting this notion of comity is that the federal character of the American polity means that a proper respect for the functioning of a State's judicial system requires that federal courts normally not interfere with State criminal proceedings. However, as Justice Black noted in Younger, supra, 401 U.S. at 43, 91 S.Ct. at 750, the Supreme Court has long acknowledged that an exception to this general policy of avoidance of conflict between State and federal courts was justified in extraordinary circumstances "where a person about to be prosecuted in a state court can show that he will, if the prosecution in the state court is not enjoined, suffer irreparable damages." See Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Moreover, Justice Black, in discussing the facts of the case

of Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), while disapproving of some of its language, reaffirmed the vitality of this special circumstances exception, saying:

> "These circumstances, as viewed by the Court sufficiently establish the kind of irreparable injury, above and beyond that associated with the defense of a single prosecution brought in good faith, that had always been considered sufficient to justify federal intervention." *Younger*, supra, 401 U.S. at 48, 91 S.Ct. at 752.

From Ex parte Young through *Younger*, the line of Supreme Court decisions touching upon the special circumstances exception demonstrates that the stringent comity limitation on the exercise of federal equity power, discussed hereafter, is peculiarly applicable to State criminal proceedings.

> "It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions. No person is immune from prosecution in good faith for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guaranties, is not ground for equity relief since the lawfulness or constitutionality of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for an injunction * * Where the threatened prosecution is by state officers for alleged violations of a state law, the state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted. Hence the arrest by the federal courts of the processes of the criminal law within the states, and the determination of questions of criminal liability under state law by a federal court of equity, are to be supported only on a showing of danger of irreparable injury 'both great and immediate.' " *Douglas,* supra, 319 U.S. at 163–164, 63 S.Ct. at 881.

Absent "any showing of bad faith, harassment, or any other unusual circumstance", *Younger*, supra, 401 U.S. at 54, 91 S.Ct. at 753, a criminal prosecution is an appropriate proceeding for the determination of the rights of the accused. See *Douglas*, supra, 319 U.S. at 164, 63 S.Ct. at 881. And, the underlying reason for demanding a finding that the danger of irreparable injury is "both great and immediate", Fenner v. Boykin, 271 U.S. 240, at 243, 46 S.Ct. 492, 70 L.Ed. 927 (1926), before intervening, is completely lacking when the state proceeding involved is not a criminal prosecution, either threatened or pending.

That the strict non-interference doctrine elucidated in *Younger* and its companion cases is limited to State criminal prosecutions is further evidenced by Justice Black's reference to Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed. 2d 377 (1964).

> "[T]he loyalty oath cases * * * [have not] changed *the basic principle governing the propriety of injunctions against state criminal prosecutions.*
>
> \* \* \* \* \* \*
>
> "In *Baggett* and similar cases we enjoined state officials from discharging employees who failed to take certain loyalty oaths. We held that the States were without power to exact the promises involved, with their vague and uncertain content concerning advocacy and political association, as a condition of employment. Apart from the fact that any plaintiff discharged for the exercising his constitutional right to refuse to take the oath would have had no adequate remedy at law, *the relief sought was of course the kind that raises no special problem—an injunction against allegedly unconstitutional state action (discharging the employees) that is not part of a criminal prosecution."* *Younger,* supra, 401 U.S. at 47, 91 S.Ct. at 752 (Footnote 4). (Emphasis added.)

As Justices Stewart and Harlan noted, concurring in *Younger,* supra, at 55, 91 S.Ct. at 757 (Footnote 2), "[c]ourts of equity have traditionally shown greater reluctance to intervene in criminal prose-

cutions than in civil cases." *Cf.* United States v. Wood, 295 F.2d 772, at 779 (5th Cir. 1961).

█ Nevertheless, in the instant case not only have the plaintiffs measured up to the traditional yardstick for equitable relief—no adequate remedy at law for suffering irreparable injury—but also they have convincingly demonstrated much more than even the hypothetically great and immediate irreparable loss required to surmount the comity impediment to federal intercession in a state criminal prosecution.

The broad prohibition of the State court's permanent injunction prevents the plaintiffs from going onto the campus to make speeches, to talk privately with other individuals, to sell their "underground" newspapers, or for any other purpose. It would be hard to imagine a more sweeping infringement upon First Amendment freedoms.

> "Communication is not a one way thing and any restriction on the right of even one person to speak imposes a concommitant restriction on all those whom he might address." *King,* supra, 319 F.Supp. at 660.

Thus, plaintiffs Duke and Haylon are subject to a wholesale abridgement of their rights to freedom of speech, press, assembly, and association, which inherently constitutes continuing irreparable injury. The damage suffered by plaintiffs is compounded by the fact that their current inability to communicate fully with their intended audience, North Texas State University students, results in reduced income which, of course, hinders further exercise of the whole range of First Amendment rights. The plaintiffs here are suffering "genuine and irretrievable damage." Dilworth v. Riner, 343 F.2d 226, at 232 (5th Cir. 1965). And they are suffering this damage without any adequate remedy at law, as evidenced by the State district court's refusal to consider the constitutional issues, until the course of the State's judicial processes have run to conclusion. *Cf.* United States v. McLeod, 385 F.2d

734 (5th Cir. 1967). In this case there is not merely a speculative "chilling" threat, *Dombrowski,* supra, but rather the cold reality of inestimable harm.

█ Since the comity and equity principles applied in *Younger* are not determinative of the issue of federal judicial intervention in the instant case, the question of whether Section 2283 itself bars such intercession recurs and must be disposed of. Numerous lower federal courts have concluded that Section 2283 is merely a statutory codification of the rule of comity and that it is, therefore, permissive rather than mandatory. See *e. g., Sheridan,* supra. But the Supreme Court, in an opinion by Justice Black, has very recently said otherwise.

> "On its face the present Act is an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of three specifically defined exceptions. The respondents here have intimated that the Act only establishes a 'principle of comity,' not a binding rule on the power of the federal courts. The argument implies that in certain circumstances a federal court may enjoin state court proceedings even if that action cannot be justified by any of the three exceptions. We cannot accept any such contention. In 1955 when this Court interpreted this statute, it stated: 'This is not a statute conveying a broad general policy for appropriate *ad hoc* application. Legislative policy is here expressed in a clearcut prohibition qualified only by specifically defined exceptions.' Amalgamated Clothing Workers v. Richman Bros., 348 U.S. 511, 515–516 [75 S.Ct. 452, 99 L.Ed. 600] (1955). Since that time Congress has not seen fit to amend the statute and we therefore adhere to that position and hold that injunctions against state court proceedings otherwise proper under general equitable principles must be based on one of the specific statutory exceptions to § 2283 if it is to be upheld." Atlantic Coast Line Railroad Co. v.

Brotherhood of Locomotive Engineers, 398 U.S. 281, at 286–287, 90 S.Ct. 1739, 1743, 26 L.Ed.2d 234 (1970).

Justice Black's conclusion that the Anti-Injunction Act's broad prohibition is independent of the principle of comity seems warranted by the historical evidence, for the passage of the anti-injunction provision preceded the initial judicial statement of the principle of comity by over a decade. See Diggs & Keith v. Wolcott, 4 Cranch 179, 8 U.S. 179, 2 L. Ed. 587 (1807). It is submitted, however, that this one inconspicuous clause of Section 5 of the two page Act of March 2, 1793, ch. 22, 1 Stat. 334–335.* was not intended to have the broad sweep that has been given its modern version.

> "[I]ts plain grammatical sense indicates that it is directed only to individual 'judge[s] of the supreme court', and not to United States courts.
>
> \*　\*　\*　\*　\*　\*
>
> "The anti-injunction provision was not interpreted by the Supreme Court until 1872, almost eighty years after its passage, when the Court, without discussing the issue, held that it barred injunctions issued by lower federal courts. Congress thereafter enacted a version of the provision in language clearly applying the ban to courts of the United States." John Daniel Reaves and David S. Golden, "The Federal Anti-Injunction Statute in the Aftermath of Atlantic Coast Line Railroad," 5 Ga.L.Rev. 2, at 297 (Winter 1971).

But, the fact is that the policy considerations behind both the present statute and the comity doctrine are similar.[11]

> "Moreover since the statutory prohibition against such injunctions in part rests on the fundamental constitutional independence of the States and their courts, the exceptions should not be enlarged by loose statutory construction.

Proceedings in state courts should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately this Court." *Atlantic Coast Line,* supra, 398 U.S. at 287, 90 S.Ct. at 1743. *Cf. Younger,* supra, 401 U.S. 37, at 38–58, 91 S.Ct. 746 at 748–756.

When enacting the general statutory codification that for the first time framed the anti-injunction provision explicitly as a limitation on "any court of the United States", Congress placed the provision by itself in Section 720 and provided that a federal court sitting in a bankruptcy proceeding was excepted therefrom. Revised Statutes of 1874, ch. 12, 18 Stat. 134. The provision was unchanged by the revision of March 3, 1911. 28 U.S.C. § 379, ch. 231, § 265, 36 Stat. 1162.

Then in 1941, the Supreme Court handed down the decision in Toucey v. New York Life Insurance Co., 314 U.S. 118, 62 S.Ct. 139, 86 L.Ed. 100. In his opinion for the Court, Justice Frankfurter discussed, *Toucey,* supra at 132–139, 62 S.Ct. 139, seven exceptions of various kinds to the anti-injunction provision, and then held that it forbade one of them, the enjoining of a proceeding *in personam* in a state court on the ground that the claim in controversy had been previously adjudicated by the federal court. When again revising the law, on June 25, 1948, Congress responded by amending the provision to except "an injunction to stay proceedings in a State court \* \* \* where necessary in aid of its jurisdiction, or to protect or effectuate its judgments," thereby restoring the relitigation exception, 28 U.S. C.A. § 2283, ch. 646, 62 Stat. 968. The Revisor's Note commented,

> "[t]herefore the revised section restores the basic law as generally un-

---

\* "Writs of ne·exeat and of injunction may be granted by any judge of the supreme court . . . but no . . . writ of injunction [shall] be granted to stay proceedings in any court of a state."

11. It is unchallenged that the statute, unlike the comity doctrine, applies equally to criminal, civil and equitable matters.

derstood and interpreted prior to the *Toucey* decision."

But more important for the instant case is the fact that the specific reference to bankruptcy was dropped and replaced by a general exception referring to exceptions "expressly authorized by Act of Congress." About this, the Revisor's Note said,

"[a]n exception as to Acts of Congress relating to bankruptcy was omitted and the general exception substituted to cover all exceptions."

In 1955, Justice Frankfurter rightly noted, regarding "express" exceptions, that

"[o]f course no prescribed formula is required; an authorization need not expressly refer to § 2283." *Amalgamated Clothing Workers*, supra, 348 U.S. at 516, 75 S.Ct. at 455.

A decade later, the Fifth Circuit, in holding the Civil Rights Act of 1964 to be such an express authorization, cited this proposition and concluded,

"[n]or do we believe that the language of the authorizing statute need refer to the subject matter of federal stays of state court proceedings." *Dilworth*, supra, 343 F.2d at 230.

In *Toucey* itself, supra, 314 U.S. at 133, 62 S.Ct. at 144, Justice Frankfurter affirmed that the Act of 1851 limiting the liability of shipowners was an exception to the Anti-Injunction Act, because

"[b]eing a 'subsequent statute' to the Act of 1793, this provision operates as an implied legislative amendment to it."

Likewise, a few years later, Justice Black wrote for a unanimous Court that

"[w]hile we realize that Section 265 embodies a longstanding governmental policy to prevent unnecessary friction between state and federal courts, Toucey v. New York Life Insurance Co., 314 U.S. 118 [62 S.Ct. 139, 86 L. Ed. 100], we still hold as we held in Bowles v. Willingham, 321 U.S. 503 [64 S.Ct. 641, 88 L.Ed. 892], that Section 205 of the Price Control Act

which authorizes the Price Administrator to seek injunctive relief in appropriate courts, including federal district courts, is *an implied legislative amendment to Section 265, creating an exception to its broad prohibition.* This is true because Section 205 authorizes the Price Administrator to bring injunction proceedings to enforce the Act in either state or federal courts, and this authority is broad enough to justify an injunction to restrain state court evictions. But if Section 265 controls, as the District Court held, the Administrator here could not proceed in the federal court, since there is a proceeding pending in a state court. Since the provisions of the Price Control Act, *enacted long after Section 265,* do not compel the Administrator to go into the state courts but leave him free to seek relief in the federal courts, he was not barred by Section 265 from seeking an injunction to restrain an unlawful eviction." Porter v. Dicken, 328 U.S. 252, at 254–255, 66 S.Ct. 1094, 1096, 90 L.Ed. 1203 (1946). (Emphasis added.)

The defendants in this case have contended, as has been succinctly noted elsewhere, that

"[a]n initial reading of the opinion in *Atlantic Coast Line* does give the impression that its stoic refusal to bend to judicially created exceptions means that section 2283 is absolute in its application." Reaves and Golden, supra, at 307.

But it must be remembered that several exceptions, of varying degrees of explicitness, are firmly imbedded in the law. See Reaves and Golden, supra, at 299–301. Furthermore, it must be recognized that the Supreme Court has studiously avoided deciding whether Section 1983 constitutes an express exception to Section 2283.

"We, therefore find it unnecessary to resolve the question whether suits under 42 U.S.C. § 1983 (1958 ed.) come under the 'expressly authorized' exception to § 2283." *Dombrowski*, supra,

380 U.S. at 484, 85 S.Ct. at 1120 (Footnote 2).

"The District Court held that § 2283 prohibited the court from enjoining or abating the criminal prosecutions initiated against the appellants prior to the filing of the suit on April 13, 1964, and further, that 42 U.S.C. § 1983 creates no exception to § 2283. 262 F.Supp. 873, 878. We find it unnecessary to resolve either question and *intimate no view whatever upon the correctness of the holding of the District Court.*" Cameron v. Johnson, 390 U.S. 611, at 614 (Footnote 3), 88 S.Ct. 1335, 1337, 20 L.Ed.2d 182 (1968). (Emphasis added.)

"We do not reach the issue of whether 28 U.S.C. § 2283 would bar the injunction sought even if irreparable injury had been shown." Bokulich v. Jury Commission of Green County, 394 U.S. 97, at 99 (Footnote 2), 89 S. Ct. 767, at 768, 22 L.Ed.2d 109 (1969).

Because he disagreed with the majority's holding in *Younger* limiting the scope of *Dombrowski* relief, Justice Douglas reached this critical issue and concluded that

"[t]he 'anti-injunction' statute, 28 U.S.C. § 2283, is not a bar to a federal injunction under these circumstances.

\* \* \* \* \* \*

"The Civil War Amendments made civil rights a national concern. Those Amendments, especially § 5 of the Fourteenth Amendment, cemented the change in American federalism brought on by the war. Congress immediately commenced to use its new powers to pass legislation. Just as the first judiciary Act, 1 Stat. 73, and the 'anti-injunction' statute represented the early views of American federalism, the Reconstruction statutes, including the enlargement of federal jurisdiction, represent a later view of American federalism.

"One of the jurisdiction-enlarging statutes passed during Reconstruction was the Act of April 20, 1871." *Youn-*

*ger,* supra, 401 U.S. at 60, 91 S.Ct. at 761 (dissenting opinion).

Both the historical context in which it was enacted and the legislative history of its enactment make it apparent to this court that Section 1983 constitutes an expressly authorized exception to Section 2283.

A cursory examination of the Virginia Commission on Constitutional Government's compilation (from Issues of *The Congressional Globe* and *Congressional Record*) of contemporaneous debates demonstrates that both proponents and opponents understood that the provision currently codified as Section 1983 was intended to authorize federal judicial intervention in State judicial proceedings when necessary to vindicate the constitutional rights protected thereby. In comparing Section 1 of the Act of 1871, *i. e.,* 42 U.S.C.A. § 1983, to Section 2 of the Civil Rights Act of April 9, 1866, 14 Stat. 27, reenacted as §§ 17, 18 of the Act of May 31, 1870, 16 Stat. 140, 144, 18 U.S.C. § 242, which provided a criminal redress for deprivation of rights under color of State law on account of race, color, or former slavery, Representative Samuel Shellbarger of Ohio said that

"[t]his section of this bill, on the same state of facts, not only provides a civil remedy for persons whose former condition may have been that of slaves, but also to all people where, under color of State law, they or any of them may be deprived of rights to which they are entitled under the Constitution by reason and virtue of their national citizenship." Virginia Commission on Constitutional Government, The Reconstruction Amendent Debates, at 493 (1967).

Later, Representative Shellbarger noted rhetorically that,

"if it be true that when a State by the intimidation of the authorities, or the corruption of the courts, or juries, or witnesses, cannot secure to all persons the equal protection of the laws \* \* Congress has no power to enact a law

by which the citizen may be protected, it is time that the country should know it." Virginia Commission, at 537.

Soon thereafter, Representative Benton C. Cook of Illinois replied that,

"[t]he proposition we maintain is that wherever the Constitution of the United States secures a right to a citizen Congress may enforce and protect that right. One absolute test is this: Congress may legislate to protect any right the denial of which by a State court would give the citizen affected thereby a right of appeal to the Supreme Court of the United States for redress." Virginia Commission, at 538. See other matter on judicial action as State action, at 502, 508, 512, 523, 529, 534, 539, 543, 545, 551, 552, 554, 556. Cf. Monroe, supra, 365 U.S. at 171–185, 81 S.Ct. 473.

In Amalgamated Clothing Workers, supra, 348 U.S. at 515, 75 S.Ct. at 455, Justice Frankfurter rejected the contention that

"the state court is 'wholly without jurisdiction over the subject matter, having invaded a field preempted by Congress.'

\* \* \* \* \* \*

"As we have noted in the Weber case, the areas that have been pre-empted by federal authority and thereby withdrawn from state power are not susceptible of delimitation by fixed metes and bounds.' 348 U.S. [468, at 480, 75 S.Ct. 480, at 487, 99 L.Ed. 546]. What is within exclusive federal authority may first have to be determined by this Court to be so."

In the instant case, of course, it is not contended that the federal courts have exclusive jurisdiction over the subject matter. The proposition advanced is that the Congress intended the federal judiciary to have a supervening role in protecting individual civil rights. This proposition finds ample support in the findings and conclusions of the Supreme Court in Monroe, supra, 365 U.S. at 175–176, 180, 182, 81 S.Ct. at 478, 480, 481.

"While one main scourge of the evil—perhaps the leading one—was the Ku Klux Klan, the remedy created was not a remedy against it or its members but against those who representing a state in some capacity were unable or unwilling to enforce a state law.

\* \* \* \* \* \*

"It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies.

\* \* \* \* \* \*

"Opponents of the Act, however, did not fail to note that by virtue of § 1 Federal courts would sit in judgment on the misdeeds of state officers." Cf. Zwickler v. Koota, 389 U.S. 241, at 245–252, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

■ Since one of the primary evils attacked by the Act of 1871 was the Southern courts' failure to enforce laws to protect the rights of persons victimized by the Ku Klux Klan, the Act's promise would have been hollow indeed if it were emasculated to prevent relief from depradations against civil liberties by State courts.

"In Pierson v. Ray, 1967, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288, the Supreme Court held that judges are immune from liability for damages in suits under 42 U.S.C. § 1983. The case does not, of course, mean that they may not be enjoined from pursuing a course of unlawful conduct." McLeod, supra, 385 F.2d at 738. (Footnote 3).

The definition set out in United States v. Classic, 313 U.S. 299, at 326, 61 S.Ct. 1031, at 1043, 85 L.Ed. 1368 (1941), is as applicable to a judge as to any other state official.

"Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." Cf. Screws v. United States, 325 U.S. 91, at 107–113, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).

It is persuasive that the Civil Rights Act of 1871 was denominated as for the purpose of enforcing the Fourteenth Amendment, especially Section 5 thereof. See *Monroe*, supra, 365 U.S. at 171, 81 S.Ct. 473. Since Shelley v. Kraemer, 334 U.S. 1, at 14–18, 68 S.Ct. 836, 92 L. Ed. 1161 (1948), it has been ineluctable that a deprivation of liberty by a State court came within the purview of the Fourteenth Amendment.

"The short of the matter is that from the time of the adoption of the Fourteenth Amendment until the present, it has been the consistent ruling of this Court that the action of the States to which the Amendment has reference includes action of state courts and state judicial officials. Although, in construing the terms of the Fourteenth Amendment, differences have from time to time been expressed as to whether particular types of state action may be said to offend the Amendment's prohibitory provisions, it has never been suggested that state court action is immunized from the operation of those provisions simply because the act is that of the judicial branch of the state government." *Shelley*, supra, at 18, 68 S.Ct. at 844.

In an opinion specially concurring in Ware v. Nichols, 266 F.Supp. 564, at 569–570 (5th Cir. 1967), Judge Wisdom well summarized the basis for

"42 U.S.C. § 1983, to say nothing of 28 U.S.C. § 1343 * * * [being] an express exception to 28 U.S.C. § 2283.

* * * * * *

"As the Court said in Cox v. State of Louisiana, (II), 5 Cir. 1965, 348 F.2d 750:

* * * * * *

" 'The general principle, basic to American Federalism, that United States courts usually should refrain from interfering with state courts' enforcing local laws is unassailable. But the sharp edge of the Supremacy Clause cuts across all such generalizations. When a State, under the pretext of preserving law and order uses local laws, valid on their face, to harass and punish citizens for the exercise of their constitutional rights or federally protected statutory rights, the general principle must yield to the exception: the federal system is imperiled.'

"I go along with Judge Rives's dissent in Cameron v. Johnson, S.D.Miss. 1966, 262 F.Supp. 873:

" 'the danger to freedom of speech and assembly of such a broad and vague delegation of power as here involved is too great to expose it to the long road of case-by-case litigation in the hope that some day the statute's reach will be narrowed to constitutionally permissible limits.'

"This case involves no federal invasions of states rights protected by Section 2283. Instead, this case requires rightful *federal interposition* under the Supremacy Clause to protect the individual citizen against the state invasion of his constitutionally protected national rights as a citizen of the United States."

The statutory purpose of Section 1983 requires no less.

An analysis somewhat like Judge Wisdom's, and based on an exposition of the available documentary evidence, led the Supreme Court to deny the applicability of the abstention doctrine, which had its genesis in Railroad Commission of Texas v. Pullman Company, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), to actions under Section 1983. Here, a quotation from Justice Douglas's opinion in McNeese v. Board of Education, 373 U.S. 668, at 671–674, 83 S.Ct. 1433, at 1435–1437, 10 L.Ed.2d 622 (1963) will serve

to present the premise that "abstention is not proper when the jurisdiction of a federal court is invoked to enforce federal legislation designed to protect civil rights." *Maraist*, supra, at 539.

"We have previously indicated that relief under the Civil Rights Act may not be defeated because relief was not first sought under state law which provided a remedy. We stated in Monroe v. Pape, 365 U.S. 167, 183, [81 S.Ct. 473, 5 L.Ed.2d 492]:

> " 'It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.'

"The cause of action alleged here is pleaded in terms of R.S. § 1979, 42 U.S.C. § 1983.

> \*　\*　\*　\*　\*　\*

"That is the statute that was involved in Monroe v. Pape, supra; and we reviewed its history at length in that case. 365 U.S. at 171 et seq., [81 S.Ct. 473]. The purposes were severalfold—to override certain kinds of state laws, to provide a remedy where state law was inadequate, 'to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice' (*id.*, 174, [81 S.Ct. 473]), and to provide a remedy in the federal courts supplementary to any remedy any State might have. *Id.*, 180–183, [81 S.Ct. 473].

"We would defeat those purposes if we held that assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state court.

> \*　\*　\*　\*　\*　\*

"Where strands of local law are woven into the case that is before the federal court, we have directed a District Court to refrain temporarily from exercising its jurisdiction until a suit could be brought in the state court.

See Railroad Comm'n [of Texas] v. Pullman Co., 312 U.S. 496 [61 S.Ct. 643, 85 L.Ed. 971]; Thompson v. Magnolia Co., 309 U.S. 478, [60 S.Ct. 628, 84 L.Ed. 876]; Harrison v. N.A.A.C.P., 360 U.S. 167, [79 S.Ct. 1025, 3 L.Ed. 2d 1152]. Thus we have stayed the hands of a Federal District Court when it sought to enjoin enforcement of a state administrative order enforcing state law, since any federal question could be reviewed when the case came here through the hierarchy of state courts. Burford v. Sun Oil Co., 319 U.S. 315, [63 S.Ct. 1098, 87 L.Ed. 1424]. The variations of the theme have been numerous.

"We have, however, in the present case no underlying issue of state law controlling this litigation. The right alleged is as plainly federal in origin and nature as those vindicated in Brown v. Board of Education, 347 U.S. 483, [74 S.Ct. 686, 98 L.Ed. 873]. Nor is the federal right in any way entangled in a skein of state law that must be untangled before the federal case can proceed. For petitioners assert that respondents have been and are depriving them of rights protected by the Fourteenth Amendment. It is immaterial whether respondents' conduct is legal or illegal as a matter of state law. Monroe v. Pape, *supra*, [365 U.S. at 171–187, [81 S.Ct. 473.] Such claims are entitled to be adjudicated in the federal courts. Monroe v. Pape, *supra*, at 183, [81 S.Ct. 473]; Gayle v. Browder, 352 U.S. 903, [77 S.Ct. 145, 1 L.Ed.2d 114], affirming 142 F.Supp. 707; Borders v. Rippy, [5 Cir.], 247 F.2d 268, 271. Cf., e. g., Lane v. Wilson, 307 U.S. 268, [59 S.Ct. 872, 83 L.Ed. 1281]; Smith v. Allwright, 321 U.S. 649, [64 S.Ct. 757, 88 L.Ed. 987]; Schnell v. Davis, 336 U.S. 933, [69 S.Ct. 749, 93 L.Ed. 1093], affirming 81 F.Supp. 872; Turner v. Memphis, 369 U.S. 350, [82 S.Ct. 805, 7 L.Ed.2d 762]."

*Cf.* Justice Brennan's excellent analysis of the federal habeas corpus relief pro-

vided by the Judiciary Act of February 5, 1867, ch. 28, § 1, 14 Stat. 385–386, in his exhaustive opinion in Fay v. Noia, 372 U.S. 391, at 415–426, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

Two astute commentators have recently observed that

"the important question of whether, despite section 2283, a federal court may, in a Civil Rights Act case, enjoin state court proceedings should not be approached solely on the issue of whether the Act is an 'expressly authorized' exception.

\* \* \* \* \* \*

"While it is clear beyond cavil that section 2283 is not susceptible to judicial improvisation, as Mr. Justice Frankfurter had stated in *Amalgamated*, it is also clear beyond cavil that there are judicially cognizable situations where the statute does not apply." Reaves and Golden, supra, at 308, 307:

There have been at least four situations in which the Supreme Court has held Section 2283, or its predecessors, to be inapplicable, contrary to what one might simplistically infer was the plain language of the statute.

The most recent such case was *Dombrowski*, in which the court enjoined criminal prosecutions which were then pending but had not technically been pending when the federal suit was filed. The court passed over the effect of its action by concluding that

"[t]his statute [§ 2283] and its predecessors do not preclude injunctions against the institution of state court proceedings, but only bars stays of suits already instituted." *Dombrowski*, supra, 380 U.S. at 484 (Footnote 2), 85 S.Ct. at 1119.

Such a result can only be viewed as a retreat from Justice Brandeis's definition.

"The prohibition of section 265 is against a stay of 'proceedings in any court of a State.' That term is comprehensive. It includes all steps taken or which may be taken in the state court or by its officers from the institution to the close of the final process. It applies to appellate as well as to original proceedings; and is independent of the doctrine of *res judicata*. It applies alike to action by the court and by its ministerial officers; applies not only to an execution issued on a judgment, but to any proceeding supplemental or ancillary taken with a view to making the suit or judgment effective. The prohibition is applicable whether such supplementary or ancillary proceeding is taken in the court which rendered the judgment or in some other. And it governs a privy to the state court proceeding \* \* \* as well as the parties of record." Hill v. Martin, 296 U.S. 393, at 403, 56 S. Ct. 278, 282, 80 L.Ed. 293 (1935). Cf. *Mariast*, supra, at 598–599.

For as Reaves and Golden, supra, at 309, have noted,

"the actual interference with the state court process caused by an injunction is the same regardless of whether the federal court issues its injunction on basis of a complaint technically filed before or after the institution of the state court action."

Likewise, there is nothing in the language of Section 2283 to support the Court's conclusions that it does not apply where the parties seeking federal injunctive relief were not identical to those involved in the state litigation at issue. Hale v. Bimco Trading, Inc., 306 U.S. 375, 59 S.Ct. 526, 83 L.Ed. 771 (1939).

More apposite to the instant case is the Court's conclusion that the injunction ban is not appropriate where state legislatures have conferred upon their courts powers which are not strictly judicial, because

"[t]o hold to the contrary would be in large measure to recognize that the exertion of the authority of the courts of the United States was dependent, not upon the nature and character of the subject-matter with which they are called upon to deal, but merely upon a state classification." Public

Service Company of Northern Illinois v. Corboy, 250 U.S. 153, at 162, 39 S. Ct. 440, 442, 63 L.Ed. 905 (1919).

In a similar vein is Leiter Minerals, Inc. v. United States, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957). Therein, Justice Frankfurter, the author of the *Amalgamated* opinion wrote as follows:

> "The statute is designed to prevent conflict between federal and state courts. This policy is much more compelling when it is the litigation of private parties which threatens to draw the two judicial systems in conflict than when it is the United States which seeks a stay to prevent threatened irreparable injury to a national interest. The frustration of superior federal interests that would ensue from precluding the Federal government from obtaining a stay of state court proceedings under the severe restrictions of 28 U.S.C. § 2283 would be so great that we cannot reasonably impute such a purpose to Congress from the general language of 28 U.S.C. § 2283 alone." *Leiter*, supra, at 225–226, 77 S.Ct. at 290–291. Cf. *Machesky*, and *Sheridan*, supra.

■ Thus, despite his protestations in *Amalgamated*, Justice Frankfurter was quite willing to recognize that the words of the statute were not as absolute as they might seem. Nothing should be more apparent than that Section 1983 was intended to establish the paramount importance in our federal scheme of constitutionally protected rights. Judge Will's scholarly and concise analysis in Landry v. Daley, 288 F.Supp. 200, at 222–223, (N.D.Ill.1968), though directed at the expressly authorized exception concept, is equally appropriate to "the accepted doctrine that federal courts are not precluded from granting an injunction whenever non-application of the broad terms of the act is justifiable." Reaves and Golden, supra, at 307.

> "Section 1983 is derived from section 1 of the 1871 'Act to Enforce the Fourteenth Amendment.' Thus, it must be construed in the light of the Civil War Amendments and the statutory protections passed by Congress during the Reconstruction period.

> "The legislation of the Reconstruction period was designed not only to secure the full rights of citizenship for all men, but also to alter the balance of power between state and federal authorities which had existed from the beginning of our federal system. The effect on the federal system of this legislation is evident from even a casual examination. For the first time, the national government was vested with the major responsibility of protecting every individual in the full enjoyment of his rights of person and property. The Fourteenth Amendment is explicit in this regard. It places clear prohibitions on the states and gives Congress the affirmative power to enforce them. The Thirteenth and Fifteenth Amendments contain similar grants to Congress. The Civil War Amendments, therefore, reflect a constitutional revolution in the nature of American federalism.

> "This revolution, in turn, represents a historical judgment. It emphasizes the overwhelming concern of the Reconstruction Congresses for the protection of newly won rights of freed men. By interposing the federal government between the states and their inhabitants, these Congresses sought to avoid the risk of nullification of these rights by the states. With the subsequent passage of the Act of 1871, Congress sought to implement this plan by expanding the federal judicial power. Section 1983 is, therefore, not only an expression of the importance of protecting federal rights from infringement by the states but also, where necessary, the desire to place the national government between the state and its citizens." Cf. *Machesky* and *Sheridan*, supra.

■ The inevitable conclusion of this necessarily protracted exegesis was

skillfully expressed by Judge Brown in the context of a significant voting rights case.

"In prescribing a suit to be brought by the sovereign for equitable relief, the statute contemplates that the full and elastic resources of the traditional court of equity will be available to vindicate the fundamental constitutional rights sought to be secured by the statute. Once Congress has vested jurisdiction of the case in a District Court, such Court has, in the absence of statutory limitations, all of the traditional powers and facilities of a court of equity. * * * Where a federal statute establishes a general right to sue, 'federal courts may use any available remedy to make good the wrong done.'

\* \* \* \* \* \*

"The aim of equity is to adapt judicial power to the needs of the situation. Thus relief in matters of public, rather than private, interests may be quite different from that ordinarily granted. Though language frequently employed might be thought to place this result on the nature of the litigant—the sovereign or an agency of Government—it is really a manifestation of the principle that the nature of the relief is to be molded by the necessities. * * * The necessities will encompass, of course, special statutory objectives. 'When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes. As this court long ago recognized, "there is inherent in the Courts of Equity a jurisdiction to * * * give effect to the policy of the legislature." Clark v. Smith [38 U.S. 195],

13 Pet. 195, 203, [10 L.Ed. 123, 127].' Mitchell v. [Robert] Demario Jewelry, 1960, 361 U.S. 288, 291–292, 80 S.Ct. 332, 4 L.Ed.2d 323." State of Alabama v. United States, 304 F.2d 583, at 590–591 (5th Cir. 1962). See Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) for an excellent discussion of the scope of the equity power of federal courts to remedy constitutional wrongs.

 Having concluded that federal district courts do have the power to provide equitable and other proper relief, e. g., declaratory judgment, 28 U.S.C.A. §§ 2201–2202, Zwickler, supra, and Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), to redress deprivations in violation of Section 1983 rights, I deem the following to be the appropriate responses to the plaintiffs' various prayers for relief: [12]

(2) The temporary restraining order and the resulting contempt conviction of Mrs. Duke are declared to have been constitutionally invalid.

(3) The university's policies concerning outside speakers are declared to be violative of the First and Fourteenth Amendments.

(4) Campus Security Regulation 3g and its source, Section 9 of Article 2919j, are declared to be unconstitutionally vague and overbroad.

(5) It is declared that Article 466a was unlawfully and unconstitutionally applied to the plaintiffs in the circumstances of this case.

(6) The enforcement by the State of Texas of the permanent injunction against plaintiffs Haylon and Duke, signed on March 26, 1971, by Judge Robert Scofield, is enjoined, from and after this date.

It is so ordered.

12. Again excluding contention (1).